JAMES HUGHES, PLAINTIFF IN ERROR v. THE TRUSTEES OF THE TOWN OF CLARKSVILLE, DEFENDANTS IN ERROR.

Construction of the act of the legislature of Virginia, entitled "an act for the locating and surveying the one hundred and fifty thousand acres of land granted by a resolution of the assembly, to George Rogers Clark, and the officers and soldiers who assisted in the reduction of the British post in the Illinois," passed on the 18th of October 1790, of the act of 1783 entitled "an act for surveying and apportioning the lands granted to the Illinois regiment, and establishing a town within the grant," and also of the act entitled "an act to amend an act entitled an act for surveying and apportioning the lands granted to the Illinois regiment, and establishing a town within the grant," passed in 1790.

Construction of the act of the legislature of Virginia, passed in December 1783, adding the territory north-west of the river Ohio to the United States; and of the deed of cession of the same territory, executed on the 1st of March 1784.

That a lessee will not be allowed to deny the title of his lessor, is admitted; but it is not admitted that a contract executed for the purpose of conveying and acquiring an estate in fee, but wanting that legal formality which is required to pass the title, may be converted into an agreement contemplated by neither party; and by this conversion, estop the purchaser, while it leaves the seller free to disregard the express stipulation.

THIS case was brought before the court by a writ of error to the district court of the United States for the district of Indiana.

The case was argued by Mr Coxe and Mr Bibb, for the plaintiff in error, and by Mr Howk for the defendants.

The facts are stated in the opinion of the court.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of ejectment originally brought by Joseph Bartholomew and others, trustees of the town of Clarksville, in the circuit court for the county of Clark in the state of Indiana, and removed on the petition of the original defendant into the court of the United States for that district.

The parties agreed on a case in the following words:

"John Doe ex dem. Joseph Bartholomew, &c. Trustees of the Town of Clarksville v. James Hughes.

The lessors of the plaintiff derive their title to the lands in

VOL. VI.—2 W

the declaration mentioned, from the state of. Virginia, by virtue of an act of the general assembly of said state of Virginia, passed in the year 1783, and entitled "an act for surveying and apportioning the lands granted to the Illinois regiment, and establishing a town within the said grant;" and also of another act of the general assembly of the state of Virginia, passed in the year 1790, entitled "an act to amend an act entitled an act for surveying and apportioning the lands granted to the Illinois regiment, and establishing a town within the said grant;" which said acts are in the words and figures following, to wit:

"An act for the locating and surveying the one hundred and fifty thousand acres of land granted by a resolution of assembly, to Col. George Rogers Clark, and the officers and soldiers who assisted in the reduction of the British post in the Illinois. Be it enacted by the general assembly, that William Fleming, John Edwards, John Campbell, Walker Daniel, gentlemen, and George Rogers Clark, John Montgomery, Abraham Chaplain, John Bailey, Robert Todd, and William Clark, officers in the Illinois regiment, shall be, and they are hereby constituted a board of commissioners, and that they, or a major part of them, shall settle and determine the claims to land under the said resolution. That the respective claimants shall give in their claims to the said commissioners, on or before the 1st day of April 1784, and, if approved and allowed, shall pay down to the commissioners, one dollar for every hundred acres of land, such claim, to enable them to survey and apportion the said lands. The said commissioners shall appoint a principal surveyor, who shall have power to appoint his deputies, to be approved by the said commissioners, and to contract with him for his fees. That from and after the 1st day of April 1784, the said commissioners, or a major part of them, shall proceed with the surveyor, to lay off the said hundred and fifty thousand acres of land on the north-west side of the Ohio river, the length of which shall not exceed double the breadth; and after laying out one thousand acres, at the most convenient place therein for a town, shall proceed to lay out and survey the residue, and divide the same by fair and equal lots among the claimants; but no lot or survey shall exceed five hundred acres. That the said commissioners, in their apportionments

[Hughes v. The Trustees of Clarksville.]

of the said land, shall govern themselves by the allowances made by law to the officers and soldiers in the continental army. That the said commissioners shall, as soon as may be, after the said one hundred and forty-nine thousand acres shall be surveyed, cause a plat thereof, certified on oath, to be returned to the register's office, and thereupon a patent shall issue to the said commissioners, or the survivors of them, who shall hold the same in trust for the respective claimants: and they, or a major part of them, shall thereafter, upon application, execute good and sufficient deeds for conveying the several portions of land to the said officers and soldiers.

"And be it further enacted, that a plat of the said one thousand acres of land laid off for a town, shall be returned by the surveyor to the court of the county of Jefferson, to be by the clerk thereof recorded, and thereupon the same shall be, and is hereby, vested in William Fleming, John Edwards, Walker Daniel, John Campbell, George Rogers Clark, John Montgomery, Abraham Chaplain, John Bailey, Robert Todd, and William Clark, gentlemen, trustees, to be by them, or any five of them, laid off into lots of half an acre each, with convenient streets and public lots, which shall be, and the same is hereby, established a town by the name of Clarksville. That, after the said land shall be laid off into lots and streets, the said trustees, or any five of them, shall proceed to sell the same, or so many as they shall judge expedient, at public auction, for the best price that can be had, the time and place of sale being previously advertised two months, at the court houses of the adjacent counties; the purchasers, respectively, to hold their said lots subject o the condition of building on each a dwelling house twenty feet by eighteen, at least, with a brick or stone chimney, to be finished within three years from the day of sale; and the said trustees or any five of them, are hereby empowered to convey the said lots to the purchasers thereof, in fee simple, subject to the condition aforesaid, and the money arising from such sale, shall be applied by the said trustees in such manner as they shall judge most beneficial for the inhabitants of said town. That the said trustees, or the major part of them, shall have power, from time to time, to settle and determine all disputes concerning the bounds of said lots, and to settle such rules and orders for the regular building there

on as to them shall seem best and most convenient; and in case of death, removal out of the county, or other legal disability of any of the said trustees, the remaining trustees shall supply such vacancies by electing others, from time to time, who shall be vested with the same powers as those particularly nomina-ted in this act. The purchasers of the said lots, so soon as they shall have saved the same according to their respective deeds of conveyance, shall have and enjoy all the rights, privileges, and immunities, which the freeholders and inhabitants of other towns, in this state, not incorporated, hold and enjoy. If the purchaser of any lot shall fail to build thereon within the time before limited, the said trustees, or a major part of them, may thereupon enter into such lot, and may either sell the same again, and apply the money towards repairing the streets or in any other way for the benefit of the said town, or appropriate such lot to the public use of the inhabitants of the said town."

"An act to amend an act, entitled 'an act for surveying and apportioning the lands granted to the Illinois regiment, and establishing a town within the said grant,' passed the 10th of December 1790. Be it enacted by the general assembly, that so much of the act entitled 'an act for surveying and appor-tioning the lands granted to the Illinois regiment, and estab-lishing a town within the said grant' as requires that one thousand acres of land for a town shall be laid off into half acre lots, and each to be improved by building, subject to the con-dition of building on each a dwelling house twenty feet by eighteen at least, with a brick chimney, to be finished within three years from the day of sale, is hereby repealed.

"The trustees of the said town are hereby directed to con-vey to those who have already purchased a lot or lots in said town, titles in fee simple, although the said lots may not have been improved agreeably to the requisitions of the said recited act.

"And be it further enacted, that the said trustees, or any five of them, are authorised and required to sell at public auc-tion the residue of the said one thousand acres of land, for the best price that can be had for the same at twelve months' credit, in lots not exceeding twenty acres, nor less than half an acre, taking from the purchasers bond, with approved security, for the payment thereof, and when received, to be applied to the

benefit of the said town; notice of the time and place of such sale being previously advertised two months successively in the Kentucky Gazette.

" And be it further enacted, that the said trustees shall convey to the said purchasers titles in fee; and that the said lots shall not be liable to forfeiture on account of any failure in improving the same, but that the titles thereof shall be absolute and unconditional, any thing in the said recited act to the contrary notwithstanding."

In pursuance of the act first above recited, the board of commissioners thereby constituted, appointed William Clark principal surveyor, and proceeded to lay off the one hundred and fifty thousand acres of land, and laid off for a town the said one thousand acres of land, a plat of which was, by the said surveyor, returned to the court of the county of Jefferson, to be by the clerk thereof recorded, which survey and return is in the words and figures following, to wit, and of which survey the annexed map is substantially a copy, upon which the land in controversy is correctly represented between the letters X and Y, and between two dotted lines upon the margin of the river.(a)

" Surveyed one thousand acres of land on the northwest side of the Ohio river for the town of Clarksville, agreeably to an act of the assembly, entitled 'an act for the surveying and apportioning the lands granted to the Illinois regiment, and establishing a town within the said grant.' Beginning on the bank of the Ohio river, at a small white thorn, white oak and hickory, a little below the mouth of Silver creek; running thence north, crossing Silver creek twice, one hundred and seventy poles, to a sweet gum, beech, and sugar tree; thence east, crossing said creek again, three hundred and twenty-six poles, to three beeches; thence south 40° east, eighty-six poles, to a beech and sugar tree; thence one hundred and seventy-six poles to a large sweet gum, sugar tree, and dogwood, on the bank of Mill creek; thence south, crossing said creek, one hundred and eighty poles, to a sugar and two ash trees; thence east, one hundred and fifty-eight poles, to three beeches; thence south, crossing Pond creek, two hundred and eighty poles, to

(a) The plat is omitted.

the Ohio, at two white ashes and two hickory trees; thence down the Ohio river, with its meanders, to the beginning. W. CLARK, P. Surveyor."

The said trustees, named in the above recited act, entered upon the said one thousand acres of land, and had the same laid off into streets and lots, and sold a part of the same; and and as vacancies occurred by death, removal out of the county or otherwise, the remaining trustees supplied such vacancies by electing others, from time to time: so that on the 1st day of July 1827, the said lessors of the said plaintiff, to wit, Joseph Bartholomew, John Prather, Willis W. Goodwin, Andrew Fite, John Weathers, William D. Beach, Charles Euller, Orlando Raymond, Isaac Howk, and Peter Bottorff, were the trustees of Clarksville, by being duly elected, from time to time, under the provisions of the above recited act.

At a meeting of the board of trustees of the town of Clarksville, on the 18th of March 1803, the following resolution was adopted by the board, and entered on the book of their proceedings, to wit: "the trustees, taking into consideration the great advantage that would result to the trustees of the town of Clarksville and the public in general, by opening a canal round the falls of the Ohio, on the application of George Rogers Clark, it is resolved by the board, that the rights, privileges and advantages of the ground between the front lots on the Ohio, and the Ohio from the upper line of the town of Clarksville, adjoining Isaac Bowman's lot, No. 1, in the Illinois grant, to the mouth of Mill creek, be exclusively granted to William Clark, his heirs and assigns, to be appropriated to the use of opening a canal through any part of said slip of land, on which to erect mills, wharfs, store houses, or any kind of water works that may be of public utility, or for the erection of gates, locks, &c., for the passage of boats, vessels, &c., reserving, however, between the south and eastwardly line of said front lots and the canal, the distance of hirty feet; for which privilege, the said William Clark, his heirs and assigns, are to pay the trustees or their successors one per cent on the production of all water works that may be erected on said canal, and five per cent on the toll of all kind of craft that may pass through the said canal. Provided, however, that the said William Clark, his heirs and assigns, do complete the said

[Hughes v. The Trustees of Clarksville.]

canal for the erection of water works, within seven years from this day.

At a meeting of the trustees of the town of Clarksville, on the 5th day of December 1807, the following order and resolution was adopted by said trustees, and also entered on their book of proceedings, to wit: "a memorial from William Clark, praying that the trustees will prolong the time for his complying with the conditions of a grant made to him by a former board of trustees on the 18th day of March 1803, of a slip of ground from the upper part of the town to the mouth of Mill run, was read. On motion, it was resolved, that a further time of three years be allowed for complying with the condition of said grant, on condition that the said William Clark, his heirs, &c, shall relinquish, under the former grant, the distance of thirty feet, reserved for a street between the front lots and any canal that may be opened, making a space of sixty feet the whole distance between such canal and said front lots, and that the former grant shall not extend further than to the lower basin, and that the said William Clark, his heirs, &c., shall bind himself, his heirs, &c., to build and keep up good and sufficient bridges across said canal at the intersection of every cross street, and to erect, within the period mentioned, to wit, by the 18th of March 1813, a mill or mills, to be of public utility, or open a canal agreeably to the conditions of the former grant, and to reserve to the trustees the stone in the river not necessary for the uses of effecting and continuing the improvements therein contemplated."

On the 21st November 1810, an act of the general assembly of the territory of Indiana was passed in the words and figures following, to wit: "an act for the relief of Daniel Fetter, James Hughes and Solomon Fuller.

"Whereas it has been represented to the general assembly of this territory, by sundry petitions and other documents, that by the act of the state of Virginia incorporating the town of Clarksville in this territory, the trustees thereof were authorised to dispose of the land upon which said town was laid off in half acre lots, at public auction or otherwise, as they might think proper, and whereas the said trustees, by their orders and resolutions, did dispose of a certain part of said town to general William Clark, in fee conditional, who transferred the

same to the aforesaid Fetter, Hughes and Fuller, and whereas it seems to have been the intention of the legislature of Virginia to subject the lots and land whereon the said town of Clarksville was laid off, to the control and disposition of the trustees of the said town, who, for the benefit of the proprietors therein, and for the interest of the public at large, did dispose en masse, in the manner aforesaid, of a number of lots, and it appearing by the memorial of the said Fetter, Hughes and Fuller, that the intention is to erect, for the public utility and convenience, mills and other water works on the said ground:

"SEC. 1. Therefore, be it enacted by the legislative council and house of representatives, and it is hereby enacted by the authority of the same, that the said Daniel Fetter, James Hughes, and Solomon Fuller, their heirs and assigns, be, and they are hereby considered, and shall be taken, deemed and holden, as the legal and equitable proprietors of the lots and land contained in the orders and resolutions of the said board of trustees, and the deed of transfer thereof from the said William Clark, subject nevertheless to the terms and conditions upon which the same was granted by the said board of trustees to the said William Clark." Passed November 21, 1810.

The said William Clark, prior to the passage of the act last above recited, had transferred his interest in and to the said slips of land, mentioned in said resolutions of the said trustees of Clarksville, to the said Fetter, Hughes and Fuller, and some of the persons composing the board of trustees of Clarksville at that time, individually signed the petition of said Fetter, Hughes and Fuller, to the said general assembly, for the passage of the above recited act.

Fetter, Hughes and Fuller entered upon the said slip of land, under the aforesaid orders and resolutions of said trustees, and erected thereon, on the margin of the Ohio river, a saw mill, with a pair of mill stones for grinding, in the fall of the year 1810, which mill was shortly after swept away by the floods. That in the year 1812, they erected and put into operation a grist mill, of public utility, on the same slip of land, and on the margin of the Ohio river, which remains unto this day; that to furnish a head of water for said mill, they cut through a ridge of rock in the bed of said river, lying between a channel of said river next the shore and an outer channel,

by which the water from the outer channel was brought into the channel next the shore; and that they expended in making said improvements from twelve to twenty thousand dollars.

At a meeting of the board of trustees of the town of Clarksville, on the 17th day of December 1816, the following resolution was adopted, and entered on the book of said trustees, to wit: "on motion of Willis W. Goodwin, resolved, that the clerk of this board be directed to call on Messrs Fetter and Hughes, assignees of William Clark, and inform them that it is the request of this board that they do make out and exhibit, at our next meeting, an accurate statement of all the productions of the water works, mills, canals, &c., erected on the slip of ground granted them by the trustees of Clarksville, since their commencement to the present date, and that the same be supported by affidavit." At a meeting of the said board of trustees on the 18th day of August 1817, the following entry and order were made by said trustees, on the book of their proceedings, to wit: "Messrs Fetter and Hughes produced to this board a statement of the quantity of flour manufactured at their mills, on the slip of ground granted to them by the trustees of the town of Clarksville, from the commencement to the 1st day of January 1817, showing the net proceeds thereon, by which it appears they are indebted to the trustees the sum of sixty-nine dollars ten and a half cents, and it was ordered that they pay the same to the clerk of this board."

Shortly after the making of the order last above recited, the said Fetter and Hughes paid to the clerk of the said board of trustees the sum of sixty-nine dollars ten and a half cents, in pursuance of said order. The said Fuller duly transferred his interest in said slip of land and appurtenances to said Fetter and Hughes, and said Fetter transferred his interest in the same to said Hughes, defendant herein, who, at the time of the commencement of this suit, was in possession of said slip of land and appurtenances; the said slip of land is a part of the one thousand acres laid off for a town, as above stated, and delineated on the map aforesaid, and is the land in the plaintiff's declaration mentioned; and the said trustees of the town of Clarksville, on the 1st day of September 1826, duly notified the said defendant to quit the possession of said slip of

land and appurtenances, on or before the 18th day of March then next, and defendant refused, and still refuses to quit possession thereof. It is agreed, that the parties and the court shall not be precluded by this statement of facts from inferring the existence of such other facts as may reasonably and properly be deduced from those stated."

The district court rendered judgment in favour of the plaintiffs in the ejectment; and that judgment is now before this court on a writ of error.

Questions both new and intricate have arisen in this cause; and the doubts we have entertained respecting some of them were not easily removed.

The plaintiffs in error deny that the act of 1783, from which the trustees derive their title, could pass any legal estate to them in the lands which are the subject of it.

The act appoints commissioners who are to proceed with the surveyor, from and after the 1st day of April 1784, to lay off the said one hundred and fifty thousand acres of land on the north west side of the Ohio river; and after laying out one thousand acres at the most convenient place therein for a town, shall proceed to lay out and survey the residue, and to divide the same by fair and equal lots among the claimants. A plat of the survey of the one hundred and forty-nine thousand acres thus to be divided is, when completed, to be returned to the register's office; "and thereupon a patent shall issue to the said commissioners, or the survivor or survivors of them, who shall hold the same in trust for the respective claimants." They are directed to execute deeds, &c.

This act empowers the commissioners to receive the claims of the several officers and soldiers of the Illinois regiment, and to cause the survey to be made; but no legal estate passes to them until the patent shall be issued on the survey. The date of the patent does not appear, but the survey on which it was to be issued could not be made until after the 1st of April 1784; and consequently the patent must have been issued on a subsequent day.

The law further enacts, that a plat of the said one thousand acres directed to be laid off for a town, shall be returned by the surveyor to the court of the county of Jefferson, to be by the clerk thereof recorded, and thereupon the same shall be and is

hereby vested in William Fleming, &c. trustees, to be by them or any five of them laid off into lots, &c.

The time when this plat was returned is not stated, but it must have been after the 1st of April 1784.

Previous to that day, in December 1783, Virginia passed an act ceding the territory she claimed north-west of the river Ohio to the United States; and the deed of cession was executed on the 1st of March 1784. This deed contains the following among other reservations: "that a quantity not exceeding one hundred and fifty thousand acres of land promised by this state shall be allowed and granted to the then colonel, now general George Rogers Clark, and to the officers and soldiers of his regiment who marched with him when the posts of Kaskaskia and St Vincent were reduced, and to the officers and soldiers that have been since incorporated into the said regiment, to be laid off in one tract, the length of which not to exceed double the breadth, in such place on the north-west side of the Ohio as a majority of the officers shall choose; and to be afterwards divided among the said officers and soldiers in due proportions, according to the laws of Virginia."

The plaintiff in error contends, that as the state of Virginia had conveyed all her territory north-west of the river Ohio to the United States, before any legal title was vested in the commissioners or trustees appointed by the act of 1783, the title at law was vested in the United States, and could pass only from them. That the reservation in favour of Clark's regiment, is not an exception of so much land from the deed of cession; but a stipulation that congress shall comply with the promise made by Virginia to that regiment. Consequently that the plaintiffs in ejectment had no legal title.

Had the court been required to expound these laws immediately after the deed of cession was executed, it is probable that the construction made by the plaintiff in error would have been adopted. But the opposite construction has prevailed, and all the titles in that reserve depend upon it. It is too late to controvert it.

The title of the plaintiffs in ejectment has been contested on other ground, which is more tenable.

The act directs the plat for the town to be returned to the office of Jefferson to be recorded, and declares that "thereupon

the same shall be and is hereby vested in William Fleming, &c. trustees, to be by them or any five of them, laid off into lots of half an acre each, with convenient streets and public lots, which shall be and the same is hereby established a town by the name of Clarksville." The act proceeds to prescribe the duties and the powers of the trustees. They are to sell the lots in the manner and on the conditions required by the law; to convey them to the purchasers; to determine all disputes concerning their bounds; and to settle rules and orders for regular building thereon. This enumeration of duties and powers is concluded with the following provision: " and in case of death, removal out of the country, or other legal disability of any of the said trustees, the remaining trustees shall supply such vacancies by electing others from time to time, who shall be vested with the same powers as those particularly nominated by this act." It is also enacted that " if the purchaser of any lot shall fail to build thereon within the time before limited, the said trustees, or a major part of them, may thereupon enter into such lot, and may either sell the same again," " or appropriate such lot to the public use of the inhabitants of the said town."

The legal title is undoubtedly vested in William Fleming and the other persons who are named as trustees of the town. The possession of this legal estate, however, would not have enabled them to perform the various acts which were necessary to the accomplishment of the object of the legislature. The thousand acres intended as a town, is to be laid out by these persons in their character of commissioners; and after the plat thereof shall be recorded, it is vested in them by name, after which the law prescribes their duties and powers. These are expressly enumerated. They do not grow out of the estate, but are conferred by the words of the act. Had the title been vested in other persons, the same powers might have been conferred on, and exercised by the trustees of the town. No one of their powers depends on their possessing the legal title. They might lay off the town in lots and streets, sell and convey the lots, determine their boundaries, and settle rules and orders for the regular building thereon, although the mere title should reside in others. The legal title is not identified with these powers, or connected with them by the words of

the law. The grantees are made trustees, but they receive the grant as individuals; and the mere legal estate must descend according to the law of descents, unless otherwise directed by the particular statute.

No one of the persons in whom the land is vested by the act, nor any person claiming title under any one of them, is a party to this ejectment. The inquiry then is, has the legal title, which was vested in William Fleming and others, been divested by the act, and transferred to the defendants in error? This must be determined by the act itself. The words are, " in case of death, &c. of any of the trustees, the remaining trustees shall supply such vacancies by electing others from time to time, who shall be vested (not with the same estate, but) with the same powers as those particularly nominated in this act." If the estate be not indispensable to the existence or exercise of the powers, and we think it is not; if the powers do not grow out of the estate, but are conferred by special words in the act, no necessity is perceived for supplying words which are not used in the act, and implying a transfer of the estate which the legislature has not made. It is unquestionable, that no inconvenience would result from such a construction; and we may conjecture that had it occurred to the legislature that the transfer of the estate to the new trustees might be useful, it would have been directed; but we cannot do that which the law has not done: we cannot take a trust estate from William Fleming and others, and vest it in their successors as trustees, when the law does not make the transfer.

It is probable that the legislature contemplated the immediate execution of the powers conferred by the act, which would transfer the legal estate to the purchasers. They do not appear to have contemplated the permanent residence of the legal estate in the body of the trustees, for the purposes of the act. If the trustees were to do any thing in virtue of the estate, and not of their special powers, we might expect it to be a re-entry for breach of the condition contained in the deeds they made. Yet, after providing for their continuance, even this power is expressly given to them. The legislature appears to have lost sight of the legal estate, and to have relied entirely on the powers given to the trustees and their successors for the accomplishment of their object. The powers are given to the

trustees and their successors; the estate is not given to their successors. We do not think the grant of the powers draws after it the estate. If any use is to be made of the estate which cannot be effected by the employment of the powers, it still remains, we think, in the original grantees or their heirs. If any part of the one hundred and forty-nine thousand acres has not been conveyed, the title to such part remains in the same persons. The inconvenience of resorting to the holders of the legal title is the same in both cases.

The court has not come to this conclusion without considerable doubt and difficulty: but, pursuing the words of the statute, and finding in them no transfer of the estate, we must consider it as remaining where it was placed by the legislature.

The trustees contend that the defendants below were estopped from denying their title, by the agreement of the 18th of March 1803. The legal effect of that agreement, they say, was to create a tenancy from year to year; and consequently to establish the relation of landlord and tenant between the trustees and those who claim under it.

That a lessee will not be allowed to deny the title of his lessor, is admitted; but it is not admitted that a contract executed for the purpose of conveying and acquiring an estate in fee, but wanting those legal formalities which are required to pass the title, may be converted into an agreement contemplated by neither party; and by this conversion estop the purchaser, while it leaves the seller free to disregard his express stipulations.

The resolutions entered into by the board of trustees on the 18th of March 1803, constitute a contract which was intended by all parties to invest William Clark with a permanent estate. The trustees resolve "that the rights, privileges and advantages of the ground" described in the resolution, "be exclusively granted to William Clark, his heirs and assigns, to be appropriated to the use of opening a canal through any part of the said slip of land, on which to erect mills, wharfs, store houses, or any kind of water works that may be of public utility, or for the erection of gates, locks, &c. for the passage of boats, vessels, &c." For this privilege, the trustees reserved "one per cent on the production of all water works that may be erected on the said canal, and five per cent on the toll of all kind of craft that may pass through said canal." To this

grant was annexed this provision.    "Provided, however, that the said William Clark, his heirs and assigns, do complete the said canal for the erection of water works within seven years from this day."    This time was afterwards extended to ten years.

The assignees of William Clark took possession of the premises under this agreement, and sold to others, who have expended from one to two thousand dollars on the work; and have erected a saw mill, which has been carried away; and a grist mill, which is now in operation, and of great public utility.

It is impossible to doubt the intention of the parties to this contract.    The grant for which the trustees stipulate is to William Clark, his heirs and assigns.    A tenancy from year to year, is directly repugnant to this stipulation.    The money to be expended on the great works in contemplation, is entirely inconsistent with any other than a permanent estate.    The views of the parties are entirely defeated; the contract is annulled by treating it as one which the trustees might determine at their will, or at the end of any year.    Had the contract been clothed with legal form by the execution of a deed, such deed would have conveyed an estate to William Clarke, his heirs and assigns.    The reservation of the per centage on the building and canal, as the consideration of the grant, instead of a sum in gross; could not affect the permanence of the estate.    The trustees could not have maintained an ejectment after the execution of such deed, unless some one of the conditions contained in it, on which a right to re-enter was reserved, should be broken; which breach it would be incumbent on the plaintiffs in ejectment to show.    Had these resolutions then amounted to a deed, or had the trustees placed the purchaser, in point of law, in the situation in which both parties intended by the contract to place him, this ejectment could not have been maintained, on any other principle than the breach of some condition in the deed which authorised a re-entry.

But a legal title has not been made, and those who claim under the contract cannot defend their possession by it in this action.    The trustees themselves deny its validity for this purpose, and assert a title in opposition to it.    While they would turn the purchaser out of possession, because this con-

tract has no legal operation in this action, they would give it a legal obligation on the defendant in the ejectment, which is to restrain him from making a defence which would protect his equitable rights under it.  The contract binds him, but leaves them at perfect liberty.  The moral policy of the law cannot permit this.  It is forbidden by the clearest principles of justice.  The case of Blight's Lessee v. Rochester, 7 Wash. 534, asserts this doctrine in a case nearly resembling this.  The plaintiff claimed under John Dunlap, whose title was not valid, but he insisted that the defendant must trace his title up to Dunlap, and therefore could not contest it.  The court said, "if he claims under a sale from Dunlap, the plaintiffs themselves assert a title against this contract.  Unless they show that it was conditional, and that the condition is broken, they cannot, in the very act of disregarding it themselves, insist that it binds the defendant, in good faith, to acknowledge a title which has no real existence."

Upon the authority of this case, and upon the sound principles of morality and justice which belong to the law, we do not think that the plaintiffs, while asserting a title against their contract, can be permitted to insist that the same contract binds the defendant to admit their title.

This opinion is founded on the idea that the action is brought to obtain possession against the contract, not for any failure to perform its conditions.  The trustees themselves do not place their right to re-enter and hold the premises on that ground.  The case does not state a re-entry for conditions broken; nor does it show expressly that any condition has been broken.  If it be admitted, that William Clark or his assignees would in this case be bound to acknowledge the title of the trustees, provided the trustees, on their part, acknowledge the obligation of their resolutions on themselves; it becomes necessary to inquire whether the conditions contained in those resolutions have been broken.  What are those conditions?

The resolutions are not drawn with such distinctness as to make the object of the parties clearly intelligible; or to show the extent of the engagements into which Clark entered, so as not to be misunderstood.

They are introduced by a preamble stating the "advantages that would result" " by opening a canal round the falls of the

[Hughes v. The Trustees of Clarksville.]

Ohio." They then proceed to say, "on the application of George Rogers Clark, it is resolved by the board, that the rights, privileges and advantages of the ground between the front lots on the Ohio, and the Ohio from the upper line of the town of Clarksville," &c. " to the mouth of Mill Creek, be exclusively granted to William Clark, his heirs and assigns, to be appropriated to the use of opening a canal through any part of said slip of land, on which to erect mills, wharfs, store houses, or any kind of water works that may be of public utility, or for the erection of gates, locks, &c. for the passage of boats, vessels, &c.

The preamble undoubtedly indicates that the trustees contemplated "the advantage which would result from a canal round the falls," but whether they meant to bind Clark to make the whole of that canal, is to be determined by the resolutions declaring the purposes of the grant to him.

The canal which Clark was to make, was, it is presumed, to be made through the ground ceded to him by the trustees. This extends to the mouth of Mill Creek. The case does not state whether Mill Creek empties into the Ohio below the falls. If it does not, this fact would go far in the construction of the resolutions. If it does, the fact, or something equivalent, should be shown in the case.

- The resolutions add that the rights, &c. exclusively granted, "are to be appropriated to the use of opening a canal through any part of the said slip of land, on which to erect mills, wharfs, store houses, or any kind of water works that may be of public utility."

This canal is "to pass through any part of the said slip of land;" but is not required to pass through the whole of it, and to empty into the river at the mouth of Mill creek. Its expressed purpose is to erect mills, wharfs, &c., but the erection of all of them is not required, nor is the grantee himself required to erect any of them. The canal is to be adapted to the purpose, and if it be so adapted, the requisition of the resolution is complied with. An alternative application of the canal is allowed. The resolution proceeds to say, "or for the erection of gates, locks, &c., for the passage of boats, vessels, &c. These two members of the resolutions are not connected by the copulative "*and*," but by the disjunctive "*or*."

The resolution does not require that the canal should be fitted for both purposes, but is satisfied if it be fitted for either.

The limitation of time is "provided, however, that the said William Clark, his heirs and assigns, do complete the said canal, for the erection of water works, within seven years from this day." Clark and his assignees are within the requirement of the proviso, if they complete the canal for the erection of water works within seven years; though no works of any description should be erected.

At a meeting of the trustees, held in December 1807, this subject was again taken up. A farther time of three years was allowed, on condition, among other things, that the former grant shall not extend farther than to the lower basin, and that the said William Clark shall bind himself, his heirs, &c. "to build and keep up good and sufficient bridges across said canal, at the intersection of every cross street, and to erect within the period mentioned, to wit by the 18th of March 1813, a mill or mills to be of public utility, *or* open a canal agreeably to the conditions of the former grant, &c."

The alternative is given to Clark and his assigns, either to build a mill or mills to be of public utility, or open the canal.

The case states that the mill was erected, which remains to this day. It also states, that in December 1816, the trustees called on the assignees of William Clark for a statement of the production of the water works, which account was rendered, and the money appearing to be due on it was paid. We are not informed that there was any subsequent failure in the payment of the money which became due under the contract. We are not, therefore, at liberty to suppose that the conditions of the contract have been broken on the part of Clark's assignees. The trustees, then, to sustain this ejectment, must consider themselves as absolved from the contract. Acting upon this principle, they cannot set it up against the plaintiffs in error. They cannot be permitted, while denying its obligation on themselves, to enforce it on others. Both are free, or both are bound. We are of opinion that the plaintiffs in error were at liberty in this case to controvert the title set up by the trustees in the court below.

The assignees of Clark have relied upon an act of the territorial legislature of Indiana, passed in November 1810, sup-

[Hughes v. The Trustees of Clarksville.]

plying the want of a conveyance; and declaring the assignees of the said Clark to be "the legal and equitable proprietors of the lots and land contained in the orders and resolutions of the said board of trustees," "subject, nevertheless, to the terms and conditions upon which the same was granted."

We do not mean to deny the right of the legislature to modify the future exercise of the powers possessed by the trustees of the town of Clarksville; provided they do not impair vested rights: but we are not prepared to decide this case on an act which changes the character and operation of a contract after it has been made.

This case has been decided in the state court of Indiana, and is reported in 1 Blatchford, 422. This court has considered that decision with the respect to which it is justly ent'tled. In that case the court did not examine and decide on the legal title of the trustees, because legal effect was given to the contract so far as to defeat the action. The relation of landlord and tenant, therefore, was preserved between the parties, and bound both. That relation defeated the plaintiff's action, though it estopped the defendants from controverting his title. Notwithstanding the plain meaning of the contract made by the resolutions of March 1803, to grant a permanent estate; yet that contract, though incapable of passing an estate at law to the extent intended, was capable of passing at law an estate from year to year, and in that action might be so construed. The necessary effect of this construction was the admission of the title of the lessor: but in this action no legal effect whatever is given to the contract, and it cannot therefore estop the defendant from contesting the title asserted in hostility to it. We do not consider the case as depending on local law.

We are of opinion that the plaintiff below did not show title to the possession of the premises claimed in the declaration; and that there is error in the judgment of the court for the district of Indiana in his favour.

That judgment is reversed, and judgment entered for the defendant.

Mr Justice BALDWIN dissented.

[Hughes v. The Trustees of Clarksville.]

This cause came on to be heard on the transcript of the record from the district court of the United States for the district of Indiana, and was argued by counsel; on consideration whereof, it is the opinion of this Court, that the plaintiff below did not show title to the possession of the premises claimed in the declaration, and that there is error in the judgment of the court for the district of Indiana in his favour; whereupon it is ordered and adjudged by this Court, that the judgment of the said district court in this cause be, and the same is hereby reversed, and that this cause be, and the same is hereby remanded to the said district court, with directions to that court to enter judgment for the defenda t below.