# CHARLESTON

## Webb *v.* Ritter.

Submitted February 20, 1906.    Decided May 1, 1906.

| 60 | 193 |
|----|-----|
| f63 | 85 |

| 60 | 193 |
|----|-----|
| e64 | 15 |
| 64 | 603 |
| f64 | 667 |
| 64 | 705 |

1. Taxation—*Delinquent Sale—Purchase by State—Title.*

    To vest title to land in the state, as a purchaser thereof at a sale by a sheriff for delinquency for non-payment of taxes, the same degree of strictness in compliance with the law, relating to assessment, return of delinquency and sale, is required as in the case of a valid sale to an individual.   (p. 203.)

2. Same—*Defective Sale.*

    No title vests in the state by a fatally defective sale of land made to her by a sheriff at a tax sale.  (p. 204.)

3. Same—*Failure to List Land—Forfeiture.*

    An invalid sale of land to the state for non-payment of taxes does not relieve the owner thereof from the duty of causing the same to be kept on the land books and charged with taxes, in order to prevent forfeiture of the title under section 6 of Article XIII of the Constitution.   (p. 203.)

4. Same.

    An assessor, in restoring omitted lands to the land books, under the authority vested in him by section 10 of chapter 29 of the Code, performs a purely ministerial function.  Officers charged with such duties, like private persons, act at their peril in determining what their duties are under peculiar circumstances. (p. 214.)

5. STATUTES—*Construction.*

In construing statutes, courts must presume knowledge on the part of the legislature, of the provisions of the organic law of the state, relating to the subject matter thereof, as well as of the principles of the common law, and will not impute to that body any intention to obstruct or impede the operation of constitutional provisions, or to innovate upon the settled policy of the law. (p. 205.)

6. SAME—*Construction—Other Statutes.*

Since, by the constitution of this State, the subjects of land titles and taxation are united to some extent, in one scheme or plan, set forth in Article XIII of the Constitution, all statutes, relating to either and affecting the subject matter of the provisions of said article, must be interpreted and construed in the light thereof and made to harmonize with, and conform to, said constitional plan. (p. 205.)

7. TAXATION—*Non-payment of Taxes—Forfeiture of Lands—Sale of Forfeited Lands—Rights of Grantee—Enforcement.*

In the trial of an action of ejectment, in which the plaintiff asserts title, as a claimant under a junior grant, by transfer of an elder forfeited title to him, as a person eligible to take as a transferree under section 3 of Article XIII of the Constitution, by mere payment of taxes on the land for five successive years after the year 1865, entries found in the land books of the county in which the land lies, not fully corresponding with the description of the lands as set forth in the junior patent, but agreeing in several material respects, are admissible as evidence to prove taxation of the land under said patent. (p. 214.)

8. SAME—*Entries in Land Book—Evidence of Identity.*

If, in such case, the entries in the land books and the patent agree, respecting the quantity and local description of the land and the name of one of the patentees is omitted and the names of other persons, not shown by the evidence to have had any interest in the land, inserted in lieu thereof, the variance in description does not render the entries inadmissible on the question of identity of the land taxed with the land described in the patent. (p. 214.)

9. SAME—*Payment of Taxes.*

Receipts for taxes paid under such entries and certificates of redemption from sales made thereunder to the state are admissible as evidence of payment of taxes on the land by claimants under the junior patent. (p. 215.)

10. SAME—*Documentary Evidence.*

A letter, written by the auditor of the state, to the patentee whose name did not appear in the land book entries, nearly forty years before trial, transmitting to him a certificate of redemption

from a sale made under such entries, is not admissible to prove identity of the land, though found among the papers and effects of such patentee, long after his death, and produced, for the purpose, by his grandson, one of the plaintiffs. Dissentiente, POFFEN-BARGER, JUDGE. (p. 220.)

11. TAXATION—*Forfeiture to the State—Irregular Entries on Land Books.*

Mere irregular entries of land in the land books for taxation and payment of taxes thereon, pursuant to such entry, prevent forfeiture of the title under section 6 of Article XIII of the Constitution and sustain a claimant by transfer under section 3 of said article if his status is in other respects sufficient. (p. 217.)

12. SAME—*Payment.*

Assessment of one half of a tract of land, owned in common by two or more persons, in the name of one tenant and the residue in the name of his co-tenant, does not invalidate or nullify the effect of payment of the taxes so assessed, though no partition of the land had been made. (p. 216.)

13. EVIDENCE—*Opinion Evidence—Competency as Expert.*

On the question of the identity of land on which taxes have been charged and paid, as shown by the land books and tax receipts, with land on which it is claimed such charges and payments were made, the opinion of a person whose claim to competency in respect to knowledge is based solely upon the facts that he is surveyor of the county in which the land lies, has served as deputy for the clerk of the county court of said county and executed the order of survey in the pending action, is not admissible. (p. 211.)

14. ACKNOWLEDGMENT —*Deeds—Admissibility in Evidence.*

A deed purporting to convey land situated in this state, acknowl edged in the year 1872, in the city of New York, before a commissioner for the Commonwealth of Virgina in the state of New York, recorded in this state in the county in which the land lies, and re-acknowledged, before an officer competent to take acknowledgments of deeds conveying land situated in this state, after the commencement of the action in which its use is desired as evidence, is admissible, between the parties thereto and against all other persons except subsequent purchasers claiming the land and creditors seeking to charge it, under the same title. (p. 226.)

15. VENDOR AND PURCHASER—*Constructive Notice—Record—Persons Affected.*

Constructive notice, by recordation of deeds and other instruments, is operative only among parties claiming rights under the same title. Between claimants under distinct and hostile titless, notice is ordinarily immaterial and inoperative. (p. 227.)

16.  DEPOSITIONS—*Service of Notice—Waiver.*

A deposition taken pursuant to a notice served on the attorney of a party who resides in this state, at the time of such service cannot be used as evidence, in the absence of a waiver of the lack of service. Mere silence of the party, after knowledge of the service, and of his attorney, at the time of service, does not constitute such waiver.  (p. 227.)

17.  APPEAL—*Review—Exclusion of Evidence.*

An appellate court will not disturb a verdict and judgment, because of the refusal of the trial court to admit evidence, offered after the conclusion of the introduction of evidence by both plaintiff and defendant, unless it appears that the trial court, in so doing, abused its discretionary powers, by refusing to allow an act in furtherance of substantial justice.  (p. 222.)

18.  TAXATION—*Forfeiture of Land—Non-Payment of Taxes—Disposal of Lands—Rights of Purchaser—Enforcement—Instruction—Evidence to Sustain.*

In an action of ejectment in which the plaintiff claims the title of the defendant by transfer, as a person made eligible by payment of taxes, without having possession of the land, by force of section 3 of Article XIII of the Constitution, and has introduced evidence showing the land to have been sold to the State in the year 1869 in the name of a person under whom the defendant claims, for non-payment of taxes charged thereon for the years 1867 and 1868, under proceedings fatally defective so that the title was not thereby acquired by the state, it is error to instruct the jury on the theory of title in the state by purchase at such sale.  (p. 222.)

19.  SAME.

When, in such action, the evidence shows forfeiture of the defendant's title by non-entry for taxation before the year 1884, and a redemption made from such forfeiture in said year by one under whom he claims, and there is no evidence of such forfeiture after the redemption, it is error to instruct the jury on the theory of a forfeiture and transfer of title occurring after said year.  (p. 222.)

20.  TRIAL—*Instructions.*

Mere verbal inaccuracies in an instruction, the ordinary and common sense meaning of which is plain, do not render it improper.  (p. 223.)

21.  ACKNOWLEDGMENT—*Deeds—Proof of Execution*

A deed, the execution of which is not proved otherwise than by a certificate of acknowledgment, signed by the grantee, as clerk of a county court, is properly rejected when offered as evidence.  (p. 229.)

22.  SAME.

A deed, the execution of which is not proved otherwise than by a certificate of acknowledgment, reciting that it was acknowledged

by the grantor before his deputy, as such deputy, and signed by the grantor himself, as clerk of a county court, is inadmissible as evidence, and was properly rejected by the trial court.  (p. 229.)

23. DEED—*Description.*

A deed is void for uncertainty, which describes the land not otherwise than as follows: "All that certain tract or parcel of land situate in McDowell county, West Virginia, on Ring's Branch, Peggy's Fork and Laurel Creek, all tributaries of the Dry Fork of Tug River, supposed by estimation to contain one hundred acres be the same more or less."  (p. 229.)

24. EVIDENCE—*Pedigr e.*

The recitals of a deed nearly sixty years old, as to the pedigree of the grantors, are evidence against strangers.  (p. 232.)

25. SAME—*Ancient Deeds.*

An ancient deed, made by a commissioner to the heirs of a deceased purchaser of land, under an order of sale in a proceeding to sell it as forfeited for non-payment of taxes, reciting the death of the purchaser, and inheritance by the grantees, is evidence of the facts recited, against strangers.  (p. 233.)

26. TAXATION—*Nonpayment of Taxes—Forfeiture of Lands—Disposal by State—Rights of Grantee—Enforcement—Evidence.*

A deed, made by a commissioner, appointed for the purpose, pursuant to a sale of land lying partly in this state and partly in the state of Virginia, made after division of the state, in a suit instituted in the latter state before the division, to foreclose a mortgage on the land, in which the defendant appeared and answered, admitting the debt and default and consenting to the decree of sale, is admissible as evidence, in connection with the decrees made and entered in the case, to prove a link in a chain of title.  By two Judges.  (See note by BRANNON, JUDGE.)  (p. 234, 237.)

27. CONSTITUTIONAL LAW—*Due Process of Law.*

Section 3 of Article XIII of the Constitution of this state is not in conflict with the Constitution of the United States.  (p. 230.)

28. SAME.

Section 6 of Article XIII of the Constitution of this state does not deprive any person of property without due process of law.  (p. 230.)

Error to Circuit Court, McDowell County.

Action by H. R. Webb and others against William Ritter. Judgment for plaintiffs, and defendant brings error.

*Reversed and Remanded.*

J. J. DIVINE, RUCKER, ANDERSON & HUGHES, A. W. REY-
NOLDS, JOSEPH S. CLARK, and PRICE, SMITH & SPILMAN, for
plaintiff in error.

CHAPMAN & GILLESPIE, DAVID E. JOHNSTON, and WYND-
HAM STOKES, for defendants in error.

POFFENBARGER, JUDGE:

By a judgment of the circuit court of McDowell county,
rendered on the 6th day of June, 1904, in an action of eject-
ment, H. Randall Webb and others, claiming 1,000 acres of
land under a patent, issued by the Commonwealth of Vir-
ginia to John F. Webb and Edwin L. Parker, dated July 3,
1860, recovered the same from W. M. Ritter, who claimed
it, mediately, as part of a grant of 320,000 acres, made by
the Commonwealth of Virginia to Robert Morris, on the 4th
day of March, 1795, together with $9,966.66, as compensa-
tion for damages done to it by the cutting and removal of
timber therefrom. Of this judgment, Ritter complains.

The petition for the writ of error contains fourteen assign-
ments of error, relating to the admission and rejection of evi-
dence, the instructions given at the instance of the plaintiff over
the objection of the defendant, the refusal of an instruction
asked for by the defendant and the overruling of a motion to
set aside the verdict. Said motion was based, not only on
alleged errors in the rulings of the court while the trial was
pending before the jury, but also on the following additional
contentions: First, The evidence shows the elder title, under
which Ritter claims, has never been acquired in any way by
the plaintiffs, who claim under a junior title. Second, Sec-
tion 3 of Article XIII of the Constitution of this state, by
force of which the plaintiffs claim to have acquired the Mor-
ris title by transfer, is in conflict with section 1 of Article
XIV of the Constitution of the United States, and is, there-
fore, invalid.

The theory upon which the plaintiffs predicate their action
is, that the Morris title was forfeited to the state, by failure
of the owners thereof to keep their land entered on the land
books for the purpose of taxation, and that the same, having
been so forfeited, passed to the plaintiffs, or their predeces-
sors in title, by virtue of said clause of the Constitution, as
persons, other than those for whose default the forfeiture had

accrued, having title or claim to the land, regularly derived mediately from, or under a grant from the Commonwealth of Virginia, not forfeited, which, but for the title forfeited, would be valid, and who, and those under whom they claim, have paid all state taxes charged or chargeable thereon for five successive years after the year 1865. On this branch of the case, the two principle inquiries are, first, whether the Morris grant was ever forfeited to the state, or was ever acquired by the state as a purchaser at a sale of the land, made for the non-payment of taxes charged thereon, and, second, whether, if so, there was payment of taxes on the land for any period of five successive years after the year 1865, by the claimants under the junior title, while that title itself remained in them, not forfeited for non-entry for the purposes of taxation, and not in the hands of the state as a purchaser for their delinquency. This makes it necessary to set out, somewhat in detail, the facts relating to taxation of the land under the two titles.

The Morris grant was for 320,000 acres of land, including the 1,000 acres granted to Webb and Parker. Of said Morris grant, 50,000 acres, including the Webb and Parker land, passed to Samuel Cameron, in whose name the same was charged with taxes, and, in October, 1869, sold for non-payment of the taxes thereon for the years 1865, 1866, 1867 and 1868, and purchased by the state. Thereafter it was omitted from the land books for the years 1870 to 1884, both inclusive. It is admitted in the argument that, if the sale so made to the state was valid, the state thereby acquired the title by purchase, and not by forfeiture for non-entry, and, therefore, the title was, by the sale, vested in the state absolutely. But alleged irregularity in the sale gives rise to much controversy. The affidavit of the sheriff annexed to his list of sales is said to be defective and the law, relating to the time within which the report of sales should have been returned, not to have been strictly complied with. These defects, it is said, prevented acquisition of the title by the state as a purchaser. But it is insisted that this sale and the record thereof, relieved the owner from the duty of keeping the land on the land books for subsequent years, because a statute required the tax officers to omit lands sold to the state from the land books, after the date of such a sale, and deprived the

owners of power to cause it to be taxed; wherefore the state acquired no title, either by the purchase at the land sale in 1869, or by the omission of the land from the land books thereafter from 1870 to 1884.

In the year 1881, Henry C. Auvil, commissioner of school lands for McDowell county, reported to the circuit court of said county, said 320,000 acre tract, as having been forfeited to the state for non-entry, in which report he gave the names of persons who claimed portions thereof, among whom were E. L. Parker, J. H. Parker and John F. Webb. Upon said report, the circuit court, on the 29th day of November, 1881, entered an order, awarding a rule against all the parties so named, requiring them to appear on the first day of the next term and show cause why the said tract of 320,000 acres should not be sold for the benefit of the school fund. On the 5th day of July, 1882, Max Lansburgh filed his petition and answer in the cause, averring that, as he believed, all taxes on 50,000 acres thereof, claimed by him, under the Morris title, by *mesne conveyances*, had been paid, and that the title thereto had not been forfeited; but praying that, if it should be adjudged that a forfeiture had occurred, he might be permitted to redeem the same. Subsequent proceedings in the cause resulted in a decree, permitting Lansburgh, by payment of $2,200.60, with the costs of the proceedings, to redeem said 50,000 acres; and it was further adjudged, ordered and decreed, in his favor, that he be allowed to occupy the position of a purchaser, as to said 50,000 acres of land, from the commissioner, and that said tract of land be redeemed and treated as the excess of the purchase money above the taxes, damages, interest and costs to the state, and that the title of the state to said tract of land was thereby released to him and fully exonerated and released from all forfeitures and former taxes, subject only to this qualification, that the decree should, in no wise, affect or impair any rights, titles and claims, within the boundaries of said 50,000 acre tract, that were protected under the Constitution and laws of the state, and that such titles and claims should be and remain as valid as if the order had not been entered. This is the same redemption by Lansburgh that was considered in the case of *State* v. *Jackson*, decided by this Court on appeal, and reported in 56 W. Va. at page 558. It is not pretended that, if Lansburgh,

by this redemption, re-acquired from the state the Morris title, so far as it relates to said 50,000 acre tract, it has since re-vested in the state by any forfeiture in such manner as to enable the claimants under the junior patent to acquire it. There is no evidence of any omission, for any period of five years, since that time.

To prove that their junior title had not been forfeited, by failure to keep the land charged with taxes, and thus to show themselves to have been in a position to take the benefit of the forfeiture of the Morris title, so far as it relates to, or affects, said 1,000 acre tract, the plaintiffs introduced a certificate of the clerk of the county court of said county, showing that a tract of 1,000 acres had been entered on the land books in the name of E. L. Parker and R. B. Bagby, under the description "Head of Crane Creek," for the years 1865 and 1866; in the name of E. L. Parker and P. R. Bogle, under the description "Crane Sandy River Township," for the year 1867; in the name of E. L. Parker and H. R. Bogle, under the description "Crane Creek," for the years 1868 and 1869; for the years 1871 and 1872 in the names of E. L. Parker and R. B. Bagby, under the description "Clear Fork & Crane;" for the years 1873, 1874 and 1875 in the names of E. L. Parker and John F. Webb, under the like description; and that the same was omitted for the year 1870. After 1875, no tract of 1,000 acres was charged to any of the persons above named, but the books show entries in the names of Mrs. E. Smith and J. F. Webb, respectively, and separately, for the years 1876 to 1900, inclusive, of 500 acre tracts, one to each of these parties, and each described as being one-half of 1,000 acres. Down to the year 1885, the description is "Clear Fork & Crane," and thereafter to the year 1894, the local description is omitted; and then for the years 1894 and 1895, the description is "Trap Fork Panther," and then, for the years 1896, 1897 and 1898, it is omitted, and, for the year 1899, it is "Crane Creek" and, for 1900, "Crane Sandy River District." The alleged defect in this evidence is, that down to the year 1873, the entries are not in the names of the patentees E. L. Parker and John F. Webb, but in the names of E. L. Parker and R. B. Bagby, for part of the time, and E. L. Parker and H. R. Bogle, and E. L. Parker and R. B. Bogle, for other parts of the time. They are in the names

of Parker and Webb for only three years. It is insisted that
the entries, after the year 1875, although in the names of
persons who are shown by the evidence to have some interest
in the Webb and Parker title, are not legal assessments, even
if it be conceded that the land to which these entries relate is
the land claimed under that patent, for the reason that, as
there is no evidence tending to show any partition of the land,
it was improper to assess one-half of it to one tenant in com-
mon and the other half to his co-tenant, since the statute con-
templates the entry and valuation of land for the purposes of
taxation, by tracts, in the names of the owners thereof. And it
is further objected that no evidence was introduced by the
plaintiffs, which, together with the certificate showing these
entries, sufficiently tends to prove that the land so entered is
the same land that was patented to Webb and Parker, to
justify the court in allowing it to go to the jury. As well,
perhaps, to prove such identity, as to show the entry on the
land books and payment of the taxes, certain tax receipts,
certificates of redemption and other papers were offered by
the plaintiffs, some of which were admitted over objections
and others excluded. In addition to this evidence, the testi-
mony of W. T. Tabor, a surveyor and former deputy clerk
of the county court of said county, was permitted, over the
objection of the defendant, to testify to certain facts tending
to show identity of the land.

The contention that the irregularity of the purchase made
by the state, in 1869, did not vest the title in the state, but
nevertheless rendered it insusceptible of forfeiture by omis-
sion from the land books thereafter, if tenable, would render
it unnecessary to discuss any of the rulings of the court re-
lating to the admission and rejection of evidence, or the giv-
ing and refusal of instructions, for the purpose of determin-
ing whether this verdict and judgment shall stand. It is not
claimed that any evidence justifies or tends to prove a for-
feiture of the Morris title prior to 1869, and if the situation
thereof was such after the date of that purchase that no for-
feiture could occur, the presence or absence of evidence tend-
ing to show that the plaintiffs were in a position to take the
benefit of a forfeiture after that date, would be wholly im-
material. They could not acquire title by transfer, resulting
from a forfeiture, unless the title was in a condition to be

forfeited.  Hence, it becomes necessary to determine, at the threshold of the case, whether the purchase by the state was valid, and, if not valid, whether it had the effect of preventing a forfeiture of the land, as the result of its subsequent omission from the land books.

A somewhat similar situation of a tract of land, is disclosed by the case of *Stockton* v. *Craig*, 56 W. Va. 464, and, for the plaintiff in error, it is insisted that the principles therein announced, respecting the powers and duties of clerks of county courts and assessors, to enter lands upon the tax books, and the right of an owner to have them so entered, are inconsistent with general principles of law, relating to the nature of the offices mentioned, the powers of such officers, the rules of statutory construction, and the provisions of our constitution, relating to the taxation of land and forfeiture of land titles.  The facts in that case differ very materially from those presented by this record.  There it appeared, not that there had been an abortive sale to the state, in consequence of which the land had been omitted from the tax books, but that, upon an alleged fraudulent report of a commissioner of school lands, in proceedings had thereon in the circuit court, said commissioner and others had fraudulently procurred a judicial sale of the land, on the ground of its having been forfeited to the state for non-entry, and the further ground that there had been a previous valid sale thereof to the state for non-payment of taxes.  It was because of that sale to individuals, under the alleged fraudulent decree, that the lands had been omitted from the land books. This Court decided that it was within the power of the owners of the land to cause it to be entered upon the land books and taxed in their names, notwithstanding such sale, and that, therefore, it did not protect them from the consequence of subsequent omission from the land books.  Whether any difference between a sale to the state, which fails because of irregularity in the proceedings, and a sale under a decree in a proceeding for the sale of land, on the theory that the title thereto was in the state by forfeiture or purchase, would vary, or render inapplicable, the principle enunciated in the case of *Stockton* v. *Craig*, is not discussed in the briefs.  On both sides, it seems to be conceded that it would not, and no reason is perceived why it should.

The alleged infirmity in the proceedings by which the state attempted to acquire title to the land, lies in the want of a sufficient record by the clerk of the county court, showing when the sheriff's report of the sale was returned to his office. The insufficiency of this record, to show a valid sale to the state, seems to be admitted. The statute then required the report or list of sale to the state to be returned, with a certificate of the sheriff's oath attached, to the recorder of the county within ten days after the sale. The curative provisions of the statute at that time were not sufficient to remedy such a defect. It was the duty of the recorder to note in his office the day on which the sheriff returned the list of sales. His failure to make such a memorandum, in consequence whereof his office did not show when the list was returned by the sheriff, was an omission of a material fact, appearing on the face of the proceedings, rendering any deed the recorder might make invalid. *Barton's Heirs* v. *Gilchrist*, 19 W. Va. 223. As the curative statutes, since enacted, have no retroactive effect, they do not validate the sale. *State* v. *Harmon*, 50 S. E. 828; *Collins & Daugherty* v. *Sherwood*, 50 W. Va. 133. The certificate of the Sheriff's oath to the list was not signed by him. Whether this also would amount to a fatal defect, it is not necessary to determine.

Section 32 of chapter 31 of the Code as it was then, and as it is now, required the auditor to cause such lists to be recorded in his office and provided as follows: "All such estate, right, title and interest in the real estate mentioned in such lists as would have vested in an individual purchaser thereof at such sale who had obtained proper deeds therefor and caused them to be admitted to record in the proper office, shall be by the sale and the purchase on behalf of the state vested in the state, without any deed or other conveyance therefor to the state: subject, however, to the right of redemption mentioned in the next section." The next section allowed one year within which to redeem and declared that after the expiration of that time, without redemption made, the land should be irredeemable. As such sale vests the absolute title in the state, subject to such right of redemption only, and the result of the proceeding is in the nature of a forfeiture, no reason is perceived why the same degree of strictness

in the observance of the proceedings under which such result is affected, should not be required as in the case of a sale to an individual.    It is purely a statutory proceeding, and the general rule is, that in such proceedings, the statute must be strictly complied with.    *Wilson* v. *Bell*, 7 Leigh 22, 24; *Yansey* v. *Hopkins*, 1 Munf. 419; *Christy* v. *Minor*, 4 Munf. 431; *Nalle* v. *Fenwick*, 4 Rand. 585; *Allen* v. *Smith*, 4 Leigh 231, 244; *Chapman* v. *Doe*, 2 Leigh 329, 357; *Jesse* v. *Preston*, 5 Grat. 120; *Martin* v. *Snowden*, 18 Grat. 200.

In determining whether the same strict rule shall be applied in the case of a purchase by the state as in the case of a purchase by an individual, it is necessary to keep in mind both the design to be effectuated by the purchase and the consequences flowing therefrom.    The constitution, and the plan of taxation embodied therein, must be regarded as giving color and tone to all the legislation under it.    All statutes relating to the taxation of real estate, enforcement of the payment of taxes thereon and forfeiture of titles for nonpayment thereof, are necessarily imbued with, and permeated by, the spirit of the constitution.    They must harmonize with its provisions for, if, in any instance, they conflict with it, they are void.    By that instrument, certain dispositions are made of land titles accruing to the state by forfeiture or purchase, with which the legislature has not attempted to, and probably could not, interfere.    As the result of forfeiture and purchase a great many titles pass, by sheer force of the constitution, into the hands of persons other than the former owners, from whom they were taken.    For obvious reasons, it cannot be supposed to have been the design or purpose of the framers of the constitution that any man's land should be thus taken from him and bestowed upon another, except by regular and systematic procedure, to be ordained by the legislature, nor by such procedure, unless as strictly observed and followed as must be the proceedings by which the title of one man is passed to another by a sale made to an individual by the sheriff for non-payment of taxes on the land.    As it is impossible to tell what land, purchased by the state, will pass immediately out of her hands into those of a stranger, by transfer under section 3 of article XIII of the Constitution, and what lands will remain in the hands of the State to be disposed of by sale, agreeably

to section 4 of Article XIII of the Constitution, it must be assumed that the law-making body of the state, oper-ating under the constitution knew this, and were duly impressed by their knowledge of the consequences of pass-ing a man's title into the state by purchase at a tax sale, and did not intend to lay violent hands upon the property of any citizen, to the extent of passing his title through the state to his neighbor, by a proceeding less strict and orderly than that used in effectuating the same purpose by means of a sale by the sheriff. It is a question of legislative intent, and possibly legislative power. To say it was intended that no irregularity should invalidate a sale to the state, and enforce the statute accordingly, would some-times result in depriving the citizen of his property under an illegal and void assessment, under proceedings, so defective as not to afford him any notice of the sale, and under sales for taxes which had been paid. The grounds for relief against tax sales were, at the time this one occurred, almost innumerable, and a great many still exist, notwithstanding the curatives statutes. It must be assumed that the legisla-ture knew the strictness with which statutory proceedings must be pursued in working forfeitures and taking the prop-erty of the citizen in the exercise of sovereign powers. The legislature is presumed to know the common law and not to have had any intention to depart from any established policy of the law or to innovate upon fundamental principles. Lewis, Suth. Stat. Con., section 499. I should be inclined to deny the constitutional authority of the legislature to de-prive the citizen of his property under the guise of a tax sale to the state, the proceedings being vitally defective in such respects as failing to afford notice, invalidity of the as-sessment, or lack of foundation due to prior payment of the taxes. Such would, in many instances, be the result of hold-ing an irregular tax sale to the state valid. For these rea-sons and others that could be given, we feel bound to say that the defect noted invalidated the sale made to the state and that no title was thereby acquired.

In seeking the intent of the legislature, in directing lands sold to the state to be omitted, regard must be had to the subject matter of the statute, what the legislature may be presumed to have known and anticipated, and the general

purpose and design indicated by the act.   The letter of the statute is not to be followed when it materially conflicts with, or tends to defeat, its general purpose and innovate upon the manifest policy of the law.   It was intended and hoped that every sale that would be made to the state would be regular and valid.   No defective sales were desired.   The directions to the officers were made simple and plain, to the end that none such should occur.   That the law makers expected regular and valid sales to be the general result of the operation of the statutes, and irregular and invalid sales, if any, to be occasional and few in number, may be fairly assumed.   They anticipated good sales, as a rule in the result, bad ones as the exception.   Assuming, then, that they had in view both classes, are we at liberty to say they intended this direction to the clerk or recorder to apply to both?   Can it be supposed the vastly important differences between a good sale and a bad one, was not perceived or appreciated by them?   By no means.   They must be presumed to have had it in mind and to have been duly impressed with its importance in all its bearings.   Therefore, the proper test by which to determine what they intended is to be found in the results to which adherence to the letter of the statute would lead.   If destructive of, or obstructive to, any general purpose and design, made manifest by the terms of the constitution or the statutory system, viewed as a whole, or both, regarded as constituting one grand scheme, or productive of inconsistent and absurd situations, the consequences will compel the Court to so construe the statute, if possible, as to make it harmonize with the general law.

As, in statecraft, a frequent recurrence to first principles is a salutary rule, so in the interpretation of statutes, relating to subjects, affected by constitutional provisions, it is necessary to keep that instrument constantly in view.   Therefore, in ascertaining whether this invalid sale to the state, excused the omission of the land from the land books thereafter, its provisions must have due weight and effect.   The mandate of the constitution, to every land owner, is that he shall have his land entered on the land books of the county in which it, or a part of it, is situated, and cause himself to be charged with the taxes thereon and pay the same.   Since an invalid sale to the state does not divest the owner of his title and

vest it in the state, the land still remains the property of him who owned it at the time of the attempted sale. It remains his for all purposes, and is as clearly subject to taxation as his property thereafter as if no attempt to sell it had been made. He can defeat any proceeding by the state against the land as hers, or by any person claiming the title through the state by virtue of the abortive sale. Nevertheless, under the theory advanced by counsel, he could, with impunity, suffer it to remain off the land books, and so enjoy a privilege denied, by the organic law of the state, to every other land owner, whose land is not in the same situation. The inevitable result would be two classes of land owners, tax-paying and non-tax-paying, and several classes of land, forfeitable and non-forfeitable, saleable for non-payment of taxes and unsaleable. The duration of these anomalous qualities of non-taxableness, non-forfeitableness and unsaleableness, attaching to certain tracts of land, would depend upon the number and length of the delays, incident to proceedings on behalf of the state to vindicate her rights, relating to forfeited and purchased lands. Vast areas would be tied up for long periods of time, and this probable result the legislature must be deemed to have foreseen. That body were aware also of the imperious command of the constitution that the title to any land omitted from the land books for five successive years should be forfeited and vested in the state by such omission, and that the language of that mandate contained no such exception as this statute, if given the effect it is said to have, would read into it. Whether the reason on which the framers of the constitution based this provision was sound or unsound, neither the legislature nor any court is competent to say, in the sense of disregarding or violating it, because not well founded in reason or state policy. All must allow it full and free operation, perhaps to the extent of excluding such effect as is claimed for this statute if intended. It suffices, however, for present purposes to say the courts cannot impute to the legislature an intention to thus disturb or impede the operation of this provision of the constitution, if the terms of the statute fairly and reasonably considered, will bear any other construction.

Further pursuit of this line of inquiry develops a perfect cluster of anomalous results, by the inconsistencies and ab-

surdities of which, we are bound to say the legislature never intended them.  Section 4 of Article XIII of the Constitution forms the basis of all legislation, authorizing proceedings in the courts for the sale of lands, forfeited to the state for non-entry or purchased by the state at tax sales.  That section authorizes the sale of lands, "*the title whereto shall remain in this state until such sale as is hereinafter mentioned be made.*"  It authorizes sales of land belonging to the state, and confers no authority upon the legislature to cause proceedings to be instituted for the sale of lands belonging to any person other than the state.  I do not mean to say that the legislature has not power, independently of this provision, to authorize suits against property belonging to individuals, and cause the same to be subjected to sale to satisfy demands due the state, whatever the nature of those demands may be.  But the purpose of the proceedings, authorized by chapter 105 of the Code, is the enforcement of this constitutional provision and must be read, considered and construed in the light thereof.  Having such purpose, courts must entertain them as having been instituted for that purpose only, and not for other purposes clearly outside of, and beyond, the scope of the statute.  This being true, it is, to say the least, highly probable that any such suit in which it is shown that the state has not the title to the land, must fail.  A full and complete answer to the bill would be that the sale was invalid.  The state would be unable to sustain the allegations of its bill by the evidence.  The bill probably could not be treated as one to enforce the State's lien for taxes, without doing violence to the language of the statute under which the suit was instituted.  At the time of this sale, there was no statute which authorized a suit to enforce the State's lien upon real estate for taxes.  No proceedings against the land were given by the statutes, except those of sale, through the ministerial officers of the State for non-payment, when the land had been charged with the taxes, and of forfeiture for non-entry, when it had not been charged therewith; and it is elementary law that the collection of taxes cannot be enforced in any manner other than that prescribed by the statute for the purpose.  We have a statute now, section 1 of chapter 31 of the Code, authorizing the auditor to institute a suit in equity for the enforcement of the State's lien for taxes, but.

14

no provision of that kind was enacted until 1882. Whether the State, failing to maintain a suit to sell the land as her own, could, by virtue of this new statute, upon an amended bill, now go on and enforce her lien for taxes, it is unnecessary to say, for, if that be true, and I doubt if it is, no such thing could have been done at the time the sale in this case was made, as there was then no such statute. It is clear, therefore, that any suit brought for the sale of this land, as the property of the State, as the law was prior to the Act of 1882, could have been defeated. It would not have been sustainable even to the extent of compelling the owner to pay the taxes chargeable on the land. There was a provision for redemption, but the very term "redemption" implies that there is something to be redeemed, something lost to be gotten back; and as the sale passed no title, and there was nothing to be reclaimed or redeemed, the suit, if maintainable for the purpose of enforcing payment of the taxes, would have amounted to a mere proceeding in equity for the collection of taxes, for which there was no warrant in the Constitution or any statute. How long it would have required to have reached this result, no one can tell. Some suits drag along for years. Had that been the fate of a suit founded upon this sale, the State would have been kept out of her revenues during all that time, and the land would have been off the land books, but not forfeited, as the Constitution required, and, in the absence of statutes designed to meet such emergencies, a large portion of the taxes would have been lost absolutely. Of course, where the State has the title to the land within her clutches, she has compensation, by the exaction of the interest on the taxes for the delay in obtaining her revenues; but, as I have indicated, if she has, in any way, allowed the land to escape, and get beyond the provisions of law, designed for the enforcement of the payment of her revenues, she is probably helpless and remediless.

These and other similar considerations, which will readily suggest themselves, on a careful study of our land tax system, irresistibly impel us to the conclusion that, in directing real estate purchased for the state at a sale for taxes, not to be entered in the land books, the legislature meant what the terms legally import, namely, that the real estate to be left off should be real estate purchased, in the legal sense

of the term, for the state.    It meant. real estate validly
purchased for the state, the title whereto was vested in the
state by the purchase, not merely an abortive futile pur-
chase, such as is disclosed here.    Section 10 of chapter 29
of the Code of 1868, in making it the duty of the assessor
to re-enter land which had, for any cause, been omitted,
meant that he should re-enter any land which ought to be
upon the land book, but was not, no matter for what im-
proper cause it had been left off.    By that section, the leg-
islature meant exactly what it said.    Now, what land
ought to be re-entered?    Plainly, any land, the title to
which is not in the state, for the constitution makes it the
duty of every citizen to keep *his* land, not the state's land,
on the land books and to cause himself to be charged with
taxes thereon and to pay the same, and the legislature sup-
plemented this by making it the duty of the officers to put
it on, without request of the owner, when the latter has neg-
lected his duty.

After having thoroughly considered this question, in the
light of what is said in the opinion in *Stockton* v. *Craig*,
and the briefs submitted in this case, I am thoroughly con-
vinced that the duties of assessors and clerks of county
courts, concerning the entry of land in the land books
for the purposes of taxation, are purely ministerial.    And
I do not think JUDGE DENT, by what he said in the opinion
in that case, concerning judicial and *quasi*-judicial functions,
performed by such officers, in determining what to enter
and what not to enter, for such purposes, intended to be
understood as asserting that their decisions had the force and
effect of judicial determinations.    Many of the officers are
said to perform judicial functions in the execution of purely
ministerial powers. This is illustrated by the views expressed
by this Court in the case of *Brazie* v. *Commissioners*, 25
W. Va. 213, in which a canvassing board, although acting
ministerially, were held to have incidentally performed a
judicial act.    But, in all such cases, the action of the officer
has, by force of some statute or the common law, the effect
of an adjudication.    As between certain parties, it amounts
to a *prima facie* or conclusive determination of some ques-
tion of right or title.    Taxation is of statutory creation. The
procedure, relating to it, is not defined by the common law.

For it, we must look to the statutes and the constitution. Where no right of review is expressly given, there is a presumption that the legislature intended none.     Section 94 of chapter 29 of the Code confers jurisdiction upon county courts to review certain acts of the officers charged with the keeping of the land books and assessing lands; but such power of review is not extended, by express language, beyond the entries, made in the books.    As to these, the power is broad and ample; but not a word is said about entering thereon land which ought to be on them, but is not.    That the performance of an act necessitates the exercise of judgment, and the application of legal knowledge, even to the extent of interpreting laws, or judicial decisions, does not make it judicial, or the person performing it a judicial officer.    If that were the test, by which to determine whether an act is judicial, every man who performs such acts in the course of his private business would be a judge, and we would be confronted, on every hand, with judicial acts, unimpeachable except by direct attack.    Judgment would be pitted against judgment all over the land and everything would be *res judicata* everywhere and as to everybody.    Finding no statutory provision, authorizing a review of an act of an assessor, in omitting to enter land on the books, I am of the opinion that such act has no element of judicial power in it, and is purely ministerial.    A land owner has no means of procuring the entry of his land for taxation except through the officer.    He cannot put it on with his own hand.    If the officer in a clear or doubtful case, refuse, he would probably have no remedy, if the act be regarded as a judicial one, except by *certiorari*, and that would result in the determination of the question of the validity of the assessment in a sort of *ex parte* collateral and informal way.    Besides, it would be burdensome and slow.    He might have to carry it to the court of last resort, and, prevailing there, have to litigate it all over again with the state and other adverse claimants under the sale; or, losing there, lose his land also, by forfeiture, without ever having had a test of the validity of his title by such proceeding as the law has appointed for the determination of questions of that character.    An objection of the same character might be urged against the result of a proceeding by *mandamus;* but it is incontrovert-

ibly .a more speedy remedy, and, moreover, it is not to be assumed that a man, claiming land and wanting to pay taxes on it, would be denied that privilege by any officer or any court. Who could be hurt by it? The state and every tax payer would reap benefit from it. We have no such case here and have had none. The difficulties pointed out are purely speculative. The danger to the officer, growing out of a mistake, would be no bar to a *mandamus.* Ministerial officers must decide legal questions at their peril. *Payne* v. *Staunton,* 55 W. Va. 202, 208; *Clark* v. *Miller,* 54 N. Y. 528; *Hover* v. *Barkhoff,* 44 N. Y. 113; *People* v. *Brooks,* 1 Denio (N. Y.) 457; 19 Am. & Eng. Ency. Law, 787, 791. Private individuals must take that risk. Men unwittingly commit offenses, but nevertheless go to prison in consequence thereof; and, in business transactions, mistakes of law result in financial disaster, but no man can be relieved or excused, because, necessarily determining the law for himself, he mistook it. The risk and hardship are no greater in the case of a ministerial officer than in that of a private person.

Another apparently sound view is that, even though such act be judicial and subject to review by the courts, its judicial character and effect would be so limited as not to preclude the owner from the power to compel the entry of his land. His claim of right to avoid a forfeiture for non-entry involves considerations materially different from those presented to the officers and the court in making up and correcting the land books. All that is merely incidental to the dominant purposes of obtaining the revenues, without exacting them from persons who, not owing them, want relief from erroneous charges, or, owing part or all the taxes charged, desire corrections of misdescriptions and the like. The claim of a right to have entered and charged land which has not been, involves a wholly different question, going far beyond the scope of the powers and duties of assessing officers, and affecting the safety of the title to the land, and any judicial powers they may have would be limited to the scope of their narrower jurisdiction, and beyond that their acts could not bind. If they adjudicate at all, it is only for the purpose, and to the extent, of enforcing payment of taxes. If triers of land titles, they are such for that pur-

pose only, and such power affords no basis for authority to determine, for other purposes, whether a person is the owner of property. Not a word in any statute, properly interpreted, indicates any intention on the part of the legislature to vest in an assessor or county court the power to determine further than this, whether a man has or has not title to a tract of land. The construction contended for would either give that power, or necessitate the raising of a presumption of intent to let the land remain off the books without forfeiture. Neither proposition can be entertained for a moment. See Van Fleet's For. Ad. 111, 112, 737. The general principles stated in *Wheeling & Elm Grove Ry. Co.* v. *Triadelphia*, 58 W. Va. 487, tend strongly to sustain the conclusion above expressed.

As payment of taxes on the land for five successive years, by the claimants under the junior title, is one of the essential facts to be established to give them the benefit of the elder title, if forfeited, the evidence should, of course, clearly tend to prove it. Plaintiffs must show themselves to be claimants of the land under the grant, the grant itself not to have been forfeited and the taxes on the land to have been paid by them. As failure in any one of these particulars would be fatal, the evidence must go beyond the mere fact of payment of taxes on land and show payment on the land described in the patent under which they claim. As the amount of evidence necessary to establish this fact is for the jury, until, in some proper way, it is made a matter for the court, the only question, relating to it, now to be considered, is the character of the evidence offered. If it tends, in any appreciable degree, to prove the taxes paid were taxes on the land described in the patent, the court did not err in admitting it. In respect to quantity and location, the land mentioned in the patent corresponds with that on which the taxes were charged and paid, from 1865 to 1875, inclusive, and the name of one of the patentees appears among those of the persons charged. For three years, apparently the same land that was taxed, as just stated, was charged to both Parker and Webb and to no person else. From 1876 to 1884, inclusive, the name of the other patentee, J. F. Webb, appears along with that of Mrs. Smith, a claimant of the Parker interest. Plaintiffs also adduced evidence of payment of the

taxes, charged as hereinbefore shown, by those who claim
under the Parker and Webb title, since the year 1867.
H. Randall Webb produced and filed a great many tax re-
ceipts and other papers, tending to prove payment of taxes
in the names of Mrs. E. Smith and John F. Webb. Pay-
ment of the taxes, as charged, by the claimants under the
Parker and Webb patent, is a circumstance tending to estab-
lish the identity of the land taxed with the land so claimed.
For the present, the relevancy of this evidence, its proba-
tive tendency, is the only question considered. Its weight
or value cannot be submitted to the court by a mere objec-
tion to its introduction. Its tendency to prove payment of
taxes on a tract of land, containing 1,000 acres, situated at
the head of Crane Creek, is not denied. The objection is its
alleged want of tendency to prove it to be the land described
in the patent and it must be tested by the rules prescribed
for other cases in which the issue is identity, and the evi-
dence circumstantial,

If two or more objects, having the same general charac-
teristics and qualities, bear a peculiar mark, by which they
are distinguished from all others of their kind, they consti-
tute a subsidiary class of the species or genus; but, as tested
by that mark, they form a separate and distinct class. When
it is not known that there are two or more things bearing
the same peculiar mark, but only that one has such a mark,
distinguishing it from those of the general class to which it
belongs, and the question is whether a certain thing of that
class is the one, described as having such mark, the fact that
it bears a mark of the kind specified directly tends to estab-
lish identity; and, if it has more than one peculiar charac-
teristic or quality, the probative force and effect increases
with the number of such marks shown. Moreover, any act
performed, by a claimant of a particular tract of land, rela-
ting thereto, and such in its nature as is usually done by land
owners for the care and protection thereof and the titles
thereto, as, for instance, payment of the taxes, is hardly
reconcilable with any other theory than that of belief in the
identity of the land to which he claims title. Absence of
Webb's name from the land book and the presence of those
of Bagby and Bogle, for portions of the time, are mere cir-
cumstances, tending to rebut the import of the other circum-

stances to which reference has been made. Though inconsistent on the face of the matter, they are neither conclusive of the issue, nor irreconcilable with the claim of the plaintiffs, for it must have been apparent to the court below, as it is to this Court, that, at the times indicated, Bagby and Bogle could have held an interest under the junior title, which has since been parted with. The evidence under consideration seems to fall within the rule stated, as follows, in Wigmore on Evidence, section 411: ''The evidencing feature is usually a group of circumstances, which as a whole constitute a feature capable of being associated with a single object. Rarely can one circumstance alone be so inherently peculiar to a single object. It is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot be supposed to be associated with more than a single object. The process of constructing an inference of identification thus consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together can conceivably co-exist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated.''

By omission to complain of want of sufficient authentication of the documentary evidence just discussed, we have been relieved of the necessity of reviewing the action of the court on that ground. The genuineness of the tax receipts and other papers seems to have been admitted.

Under the objection to the admission of the certificate of the clerk of the county court and the tax receipts, other important questions arise, however, namely, whether the assessment, after the year 1875, of one-half of the land to Mrs. Smith and the other to Webb, no partition having been made, was a legal and valid assessment, and, if not, whether payment under it would save the title from forfeiture, for non-entry. If the latter be answered in the affirmative, it becomes unnecessary to decide the former.

In approaching this question, it is necessary to keep in mind the purpose and object of an assessment and of all tax proceedings. One of the purposes of an assessment is, of course, to obtain equalization of the burden of taxation; but

perhaps its primary, and most vital purpose is the laying of a foundation for all the subsequent proceedings in the exaction of taxes. The assessment and all other steps prescribed by the law constitute, in substance and effect, a remedy against the citizen and property owner for the collection of money for public purposes. The legislation, prescribing these steps, though not remedial in the ordinary sense of the term, is purely so as between the state, on the one hand, and the persons and property subject to taxation, on the other. Equalization of burden and systematization of procedure are mere qualities or incidents that ought to characterize all other remedial law. Since they are remedial, and their purpose is the enforcement of a duty that the citizen owes to the public, it seems plain that it is incumbent upon nobody to see that all the requirements of law are complied with, except, as in other cases, the person to whom the remedy is given. A creditor, in seeking the enforcement of his debt, by process of law, must conform, in all respects, to the requirements of due and orderly procedure for that purpose; but, if he fails to do so, the debtor may waive the irregularity, and, in that case, he is as fully protected in his payment of the debt as if every requisite had been met down to the minutest detail. No duty rests upon the latter to see that the proceedings against him conform to the law. Why does not the same principle apply in proceedings on behalf of the state? What remedy does she need against him who voluntarily pays his taxes? If the tax-payer sees fit to waive irregularities, who can complain of it? Who has any right to complain of it? He voluntarily performs that thing, the performance of which is the purpose of all remedial laws relating thereto. Some of the decisions, rendered by this Court, may seem to conflict with the view, that payment of taxes under an irregular or invalid assessment will protect the title from sale or forfeiture; but this hostility is only apparent, and comes by way of deduction only. *Simpson* v. *Edmiston*, 23 W. Va. 675, holds that payment of taxes on land by a tax-sale purchaser, whose deed is invalid, does not inure to the benefit of the person in whose name the land was sold. A plausible argument from this would be that payment of taxes by a volunteer, a person having no interest in the land, could not operate as payment by, for, or on behalf of, the owner. That, however, is not the

theory of the decision in *Simpson* v. *Edmiston*. Point 7 of the syllabus of that case says: "Where two or more persons claim the same land under adverse title or color of title, if either desires to protect his title from forfeiture, he must enter the land on the assessor's book in his name and pay the taxes thereon." The ground, and the only ground, on which payment by the tax purchaser was held not to inure to the benefit of the true owner was the adverse and hostile character of the two titles under which the property was claimed. Mere errors in assessment, when there is no hostility of title, do not have that effect. In such cases, the court looks not to see whether the proceedings are regular, or the assessment was made in strict conformity with the requirements of the statute, but whether the taxes have been in fact paid by somebody claiming the land under the title with reference to which the tax was imposed. In *Simpson* v. *Edmiston*, JUDGE SNYDER said, after reviewing *Yansey* v. *Hopkins*, 1 Munf. 419, *Lohrs* v. *Miller*, 12 Grat. 452, *Witham* v. *Sayers*, 9 W. Va. 671, and *Bradley* v. *Ewert*, 18 W. Va. 598: "It will be observed that in all these cases the two parties assessed with taxes claimed the same land in privity and by the same title. The relation of vendor and vendee subsisted between them and neither asserted an independent or hostile title to the other. The erroneous assessments grew entirely out of the mistake of the assessor and not out of the conflicting claims or title of the parties. The payment of the taxes, therefore, by one party was a full satisfaction of the taxes legally chargeable upon the land under the title thus held in privity and successively by the vendor and vendee." *Bailey* v. *Mc-Claugherty* has been much discussed in the briefs in this case as being in conflict with the view above suggested, and it may not be in strict conformity therewith, but the facts were somewhat peculiar and extraordinary. The assessment under which payment was made was not against any person who had any title. In point of interest, he was a stranger to the land, and there was no payment of the tax assessed against the owner. It was not a case of hostility of titles, it is true, but it was nevertheless a case of absolute failure to pay the taxes validly assessed against the owner of the property, and payment by one who had no interest in it. This marks a very broad distinction between it and the case now under consid-

eration, for which reason it is unnecessary to do more here than point it out. An authority tending directly to sustain the position here taken is *Siers* v. *Wiseman*, 58 W. Va. 340, in which there was confessedly an irregular assessment. That land had been purchased at a tax sale. No deed was taken under that purchase until after the lapse of more than five years. It was a void deed, and, but for the trust relation shown to exist between the purchaser and the owner of the land, the case would have fallen under the rule in *Simpson* v. *Edmiston*. There was no assessment in the name of the owner, but there was an assessment in the name of another person who had set up an unfounded claim to the title of the owners. Notwithstanding the irregularity, this Court denied to the state the right to sell the property as having been forfeited. That case is a specimen of a class of cases in which this Court has held payment by an agent or trustee, who has wrongfully purchased the land of his principal, and caused it to be assessed to him instead of the true owner, to inure to the benefit of the true owner. It may be said that the Constitution, in requiring every land owner to cause his land to be entered on the land books, and charged with taxes, makes it incumbent upon him to cause it to be properly charged; but, as the object of that provision is to compel payment of taxes, it is remedial in its nature, and, therefore, not operative against any one who, by reason of his diligence and faithfulness as a citizen, is exempt from the operation of coercive measures provided for those who neglect the performance of their duties to the public.

These views are in harmony with the law as laid down by Cooley on Taxation, as follows: "Whether any third person may make payment is not so clear; but as the state is interested only in obtaining the revenue it has called for, it would seem that, before any sale, and consequently before any rights of third parties have intervened, any mere volunteer may pay the tax if he chooses; and the payment would be effectual, so far, at least, as to terminate the lien of the tax upon the land; though if the statute undertook to give the person making the payment rights in the land by reason thereof, the payment might not be effectual to confer such rights; for no one can assume to stand in the place of the owner for the purpose of performing an act which the owner

himself sees fit not to perform, and claim thereby to establish rights against the owner or his property by what, under such circumstances, would be an officious intermeddling. It has therefore been held that the lien which the statute gives to one who pays a tax on land attaches only in case the person paying had an interest, either personally or as agent; though if he were a mere intermeddler, and the owner should subsequently claim the benefit of the payment, there would be no injustice in holding that he thereby adopted the act of payment with all the statutory consequences. The officer who received the payment would himself be precluded from raising any question of its sufficiency." Pp. 803, 804. "Payment is an act *in pais*, which may be proved not only by the record but by the original receipt; and it may also be made out by any other evidence which satisfies a jury of the fact. But payment cannot be shown in opposition to a judicial finding at least as between the parties thereto and their privies." Pp. 807, 808.

The conclusions thus far announced dispose of the second, third, fourth and fifth assignments of error.

The seventh assignment is based upon the action of the court in admitting a letter of J. M. McWhorter, Auditor of the State, dated June 4, 1867, purporting to transmit, to John F. Webb, a certificate of redemption of the 1,000 acre tract of land, charged in the names of E. L. Parker and R.B. Bagby, from delinquency for the years 1865 and 1866. This letter was found among the papers of John F. Webb and William B. Webb, son of John F., by H. Randall Webb, grandson of William B. and exhibited with his deposition. Both the father and grandfather of the witness are dead. In my opinion, the letter was properly admitted, but my associates are of a different opinion. Its genuiness was not questioned. On its face it shows its connection with a public record in the auditor's office, and proves John F. Webb to be the man who caused that record to be made. It was found long years after his death, among his papers, and is, therefore, an ancient document, constituting a memorial of an act performed by him in his life time, relating to the payment of taxes on this land. I regard it as analagous to the case of an entry in the books of a deceased person, which are always admissible upon proof of the genuineness of the book. How-

ever, as the other members of the court decline to accept this view, it is held that the court erred in admitting the letter.

In view of the logical connection between what has been said and the instructions given and refused, the twelfth and thirteenth assignments of error relating thereto will be considered here.

Instruction No. 2, given for plaintiff, over the objection of the defendant, after reciting briefly the principal facts hereinbefore stated, relating to the taxation and sale of the 50,000 acre tract to the state in 1869, proceeds as follows: "And if the jury shall further believe from the evidence in this case, that the plaintiffs and those under whom they claim, have paid, for five successive years after the year 1865, all state taxes, charged or chargeable on the tract of land described in the grant from the Commonwealth of Virginia, to E. L. Parker and John F. Webb, dated the 3rd day of July, 1860, and in evidence in this case, and that the title of the plaintiffs thereto, is not forfeited, then the title of the State of West Virginia for so much of the said 50,000 acre tract of land as is embraced in and covered by the said grant from the Commonwealth of Virginia to the said E. L. Parker and John F. Webb, is transferred to and vested in the said E. L. Parker and John F. Webb, and those claiming under them." Instruction No. 3, given for the plaintiffs over the objection of the defendant is the same in substance and effect, the only material difference being that it is predicated on the theory of forfeiture and applies the legal proposition to claimants of the 50,000 acre tract under the Morris title, subsequent to Samuel Cameron, in whose name the alleged sale was made. As Max Lansburgh, in 1884, redeemed said tract of land, and there is no evidence tending to show a forfeiture for nonentry after 1884, it is plain that payment of taxes on the land, by the claimants under the Parker and Webb title, after the year 1884, could not give them title by transfer under section 3 of Article XIII of the Constitution, on the theory of title in the state by purchase in 1869, or forfeiture incurred after 1884. No transfer can accrue until there has been a forfeiture or acquisition of title by the state in some other way. The instruction therefore, should have limited the inquiry of the jury as to payment by the junior claimants,

for five successive years, to the time prior to the year 1884. If there was any forfeiture before that time and the plaintiffs were in a position to take the benefit of it, the subsequent redemption by Lansburg did not affect their rights. But if there was a forfeiture prior to that date, and the plaintiffs were not in a position to take it, it was released and the title revested in Lansburgh by the redemption effected by him in that year. As the invalidity of the sale to the state in 1869 was beyond question, no instruction predicated on the theory of title in the state by the alleged purchase in that year should have been given. In view of the absolute failure to produce any evidence of the return of the list of sales to the recorder's office within ten days, the court, if requested to do so, should have told the jury, as matter of law, the state had acquired no title by that purchase, and the giving of instruction No. 2, whereby it was submitted to the jury whether the state had so acquired the title, was misleading and prejudicial. Not having acquired the title by purchase in 1869, the state obtained it, if at all, five years later by forfeiture. This is a very material variation from the evidence which the instruction wrongfully injected into the case.

Another objection to these two instructions is that they submit to the jury, as a mixed question of law and fact, whether the title of the plaintiffs has been forfeited. After requiring a finding as to payment of taxes on the land, for five successive years, each says the jury must believe "the title of the plaintiffs thereto is not forfeited." As the evidence of taxation and payment of taxes, whether considered as preventing forfeiture or availing to transfer a forfeited title, is of the same character and covers the whole period, it is not perceived that there is any defect in this portion of either instruction. If the jury should find it sufficient for one of these purposes it would necessarily be sufficient for the other. The phrase "not forfeited" in section 3 of Article XIII of the Constitution seems never to have been construed. Must the claimant by transfer negative forfeiture by showing taxation to such extent as to exclude any five year period of omission? Must he show there has been no sale and purchase by the state? Is such purchase a forfeiture? Upon whom is the burden of proof? We deem it unnecessary now to decide these and other questions that might be suggested.

E. L. Parker's testimony was taken and used on the trial of the case, but he did not testify that the land on which taxes had beeh paid is the land to which he claimed title under the patent of July 3, 1860. The deposition showed no effort to prove this fact by him. Upon this state of the evidence, the court gave, at the instance of the defendant, an instruction to the effect that the silence of Parker raised a presumption that his testimony in respect to that matter would have been adverse to the plaintiffs. The giving of that instruction led the plaintiff to ask for another on the same subject which was given, over the objection of the defendant, and reads as follows: "The Court instructs the jury that although the plaintiff did not introduce E. L. Parker as a witness to identify the land in controversy in this suit, yet if they believe from the evidence in the case that the plaintiffs have identified the land in the declaration mentioned as the same tract of land charged on the land-books of McDowell county to Parker and Bagby or Parker and Bogle, then they are instructed that no inference or presumptionas to the identification of the said land arises against the plaintiffs by reason of the failure to introduce said Parker on the said point." No doubt, the intention, in giving the counter instruction, was to inform the jury that, notwithstanding the presumption in favor of the defendant, they might find for the plaintiffs on the question of identity, if they believed the evidence justified such finding. That, in our opinion, is the substantial import of the instruction. It does not contradict the one given for the defendant. One says there is presumption as to what Parker's testimony would have been; the other asserts a different proposition, namely, that there is no presumption against identity of the land, if the jury believe the evidence, considered as a whole, establishes it. In this ruling there is no error.

Instruction No. 1, given for the plaintiff over the objection of the defendant, reads as follows: "The Court instructs the jury that if they believe from the evidence in this case that some of the lines of the grant from the Commonwealth of Virginia to John D. Payne, dated the —— day of May, 1861, a certified copy of which is in evidence in this case, extend on to the land claimed by the plaintiffs, under the grant from the Commonwealth of Virginia to E.

L. Parker and John F. Webb, bearing date on the 3rd day of July, 1860, a certified copy of which is in evidence in this case, producing an interlock, that this *along* gave to the said Payne and others claiming under him, no title to any part of the land, within the said interlock." It is predicated upon claims made by the defendant under the patent therein described which, the evidence tends to show, is for land within the Morris grant and part of the land included in the Webb and Parker patent. As to both, it is junior. The objection to it is that it ignores the evidence relating to the claims made under it. Of course it can, of itself, operate only as color of title, against the older patents, but it, in connection with possession under it, and payment of taxes on the land, or payment of taxes only, if not forfeited, for the periods prescribed in section 3 of Article XIII of the Constitution, might be the means of acquiring the Morris title, to the 500 acre tract or the Webb and Parker title, to so much of it as lies in the interlock, if either of them has been forfeited. There is evidence of actual continuous possession within the bounds of both senior patents, but it is rather indefinite and uncertain. The instruction is correct as far as it goes and conforms to the theory of the plaintiffs as to the state of the evidence of possession. It is not a general instruction, covering the whole case or issue and directing a finding. If the defendant thought his evidence of possession and payment of taxes material in point of weight, he could have taken an instruction based upon it. We do not think the court erred in giving the instruction complained of.

The action of the court in refusing an instruction, asked for by the defendant, is the subject of the thirteenth assignment of error, but, as it is not referred to in the briefs, it may be deemed to have been abandoned. The object of it seems to have been to avoid the effect of the action of the court in refusing to admit a copy of certain entries appearing on the books of the auditor, tending to show that the Parker and Webb land had been sold for non-payment of taxes for the year 1868. As this evidence was not in the case, the error of the court, if any, was not in refusing the instruction, but in refusing to permit the evidence to be introduced.

The certified copy just referred to was excluded on the ground that it was offered too late. The admission and rejection of evidence offered after the taking of testimony has been closed on both sides is in the sound discretion of the court; and, unless such rejection appears to have been prejudicial, it must, of course, be sustained. In order to reverse for that reason, it must, at least, appear that the admission of the rejected evidence would have been an act in furtherance of substantial justice. We cannot see that it would have subserved any good purpose in this instance. In a former part of this opinion, it has been shown that, in order to prove a sale to the state, it is necessary to show that the list of sales was returned by the sheriff to the recorder's office, within ten days. No evidence was offered in connection with the copy from the auditor's records tending to disclose this material fact, and the copy offered fails to show it. As the case must go back to the circuit court for a new trial, the requisite omitted evidence will doubtless be supplied, if it exists. It suffices here, to say that the court did not err in rejecting the document offered.

An exception to the action of the court in admitting the testimony of W. T. Tabor, surveyor of McDowell county, as to the identity of the land on which the taxes had been paid with that described in the patent, is relied upon. In response to the question, whether there is any other tract of 1,000 acres of land on the head of Crane Creek and its waters than the one granted to Parker and Bagby, he said it was the only one he found, located at that particular point, as shown on the map in making the survey of the land in this case. In response to the question, whether there is any other tract of 1,000 acres situated at the head waters of Crane Creek, granted to Parker and Bagby, and Parker and Bogle, he said he knew of no other. He was the surveyor of the county and had, at one time, acted as deputy for the clerk of the county court, whose duty it was to make off the land books, and who was the custodian of the land records. He had also made a survey in this case, but it did not appear that he had conducted any inquiry as to the existence of the matters concerning which he testified in said two answers. The effort to sustain the admissibility of his testimony is

based on a presumption of the knowledge requisite to his competency, arising from his official experience as surveyor and deputy clerk. We do not think this alone qualifies him, wherefore we hold that the evidence should have been excluded.

The first, tenth and eleventh assignments of error relate to matters similar in principle and are, therefore, considered in the same connection. The first is based on an exception to the action of the court in admitting a deed from Edwin L. Parker to Emiline Smith and others, plaintiffs, dated the 22nd day of January, 1872. It was acknowledged before a commissioner for the State of Virginia in New York. Of course, it was not a good acknowledgment, but, on the trial of this action, the grantor re-acknowledged the deed, and the original deed bearing the certificates of both acknowledgments was admitted as evidence. Its re-acknowledgment supplied the want of proof of the execution thereof, due to the void certificate originally annexed to it. Except as to third persons, claiming the same title by a subsequent conveyance or otherwise, it may amount to proof of execution as of the time at which it was originally delivered, and as against the grantor, the new acknowledgment does so relate back. *Cahill* v. *Building Association*, 61 Ala. 232. As to the matter of delivery, the possession of the deed, at the time it was offered, is *prima facie* proof thereof, unopposed by evidence to the contrary. *Newlin* v. *Beard*, 6 W. Va. 111; *Ward* v. *Ward*, 43 W. Va. 1; *Snodgrass* v. *Knight*, 43 W. Va. 294. "Under ordinary circumstances, no other evidence of the delivery of a deed than the possession of it, by the person claiming under it, is required." *Gaines* v. *Stiles*, 14 Pet. 322.

Because of the want of a valid acknowledgment at the time the deed was copied into the records of deeds in McDowell county, it cannot have the force and effect of a recorded deed, working constructive notice to subsequent purchasers, but it may, nevertheless operate favorably to the plaintiffs, as an unrecorded deed, against all persons other than subsequent purchasers and creditors. As to the defendant, the want of a valid recordation of the deed would seem to be immaterial, since he is not a subsequent purchaser; for, if he could, under the forfeiture and transfer provisions of the

constitution, be deemed, upon any finding which the jury might make from the evidence in this case, a purchaser of the Parker and Webb title, it is certain that in the event of a different finding by the jury he would not be a purchaser of the Parker and Webb title at all. In fact, he does not seem to claim that title. As between hostile titles, it is immaterial whether a deed is recorded or not, recordation thereof being constructive notice only to subsequent purchasers of the thing purchased and creditors of the grantor as to the thing sold. Others subsequently purchasing the same property from the same grantor, are protected in their purchase, although there be a prior deed, if it be not recorded. The object of it is to protect a subsequent purchaser of the same property, and, legally speaking, he is not such a purchaser unless he purchases the same title. Webb on Record of Title, sections 162, 214; Jones on Real Prop. Convey. section 1385. The deed is admissible as an unrecorded one, and if the defendant desires to take precaution against its being treated as a recorded deed, in any aspect of the case, he must ask for an instruction for that purpose by the trial court. *Wise* v. *Postlewait*, 3 W. Va. 452.

In connection with the deed from Parker to Mrs. Smith, the plaintiff offered his deposition, taken November 22, 1902, in the city of San Francisco, upon a notice directed to the defendant, William M. Ritter, but served on Edgar P. Rucker. Said Rucker was, at that time, an attorney for Ritter in this case, but he was not so described in the return. The deposition was received by the clerk, December 5, 1902, and was not used until March, 1904, and it was stated to the court, by counsel for the defendant, that he knew of the filing of the deposition soon after it was taken. Whether it is meant that the defendant knew of it or that his attorney knew of it, is not very clear. The service was not made in accordance with the direction of the statute. When a party resides out of the state, service may be made on his attorney, Code, chapter 121, section 3, but there is no authority for such service when the party resides in the state. The service is not sustainable, unless on the ground of waiver. There are some expressions of opinion found in the decisions to the effect that, if an attorney, on being served with a notice to take depositions, makes no objection thereto, he waives the

irregularity, under his general authority to represent his client in such matters. *Buddicum* v. *Kirk*, 3 Cranch 293; *Newlin* v. *Newlin*, 3 S. & R. (Pa.) 41; *Hunt* v. *Crane*, 33 Miss. 669. In *Buddicum* v. *Kirk*, it was found that there was an express agreement of waiver by the attorney on whom the notice was served. Nothing of that kind appears here. *Newlin* v. *Newlin* seems to have been overruled in *Cunningham* v. *Jordon*, 1 Pa. St. 442, *Gray* v. *Bailey*, 16 S. &. R. (Pa.) 126, and *Snyder* v. *Wilt*, 15 Pa. St. 59. In the last case named, Rogers, Judge, said, on this point: "I am well aware it is a rule that the waiver of notice on the party cannot be implied from the attorney's omission expressly to dissent to the service on himself." In that case, the deposition, objected to on the ground of improper service, had been read in the same case on a former trial, and the court based its finding of a waiver upon that circumstance. In *Williams* v. *Gilchrist*, 3 Bibb. (Ky.) 49, it is expressly held that service on the attorney is insufficient. Such was the decision in *Cahill* v. *Pintony*, 4 Munf. 371. The departure, attempted, here, would be not only inconvenient, and a source of annoyance, to counsel, but dangerous to litigants. Though there is a distinction between a notice to take depositions and process commencing a suit, the law as indicated, out of regard for safety to the interests of parties, provides that such notice should be served on them and not on their attorneys, and it is deemed to be safer and better to adhere to the statutory rule, when it has not been dispensed with by agreement, or conduct, amounting to an estoppel. For these reasons, we think, in the absence of controlling authority, the court erred in admitting the deposition.

The ninth assignment of error relates to the exclusion from the jury of a deed from David Jones to Samuel Day, dated May 2, 1887. The objection to it is its uncertainty as to the land intended to be conveyed, the description being as follows: "All that certain tract or parcel of land situate in Mc Dowell county, West Virginia on Rings Branch, Peggy's Fork and Laurel Creek, all tributaries, of the Dry Fork and Tug River, supposed by estimation to contain one hundred acres be and the same more or less." That there is nothing in the deed by which the land can be identified is apparent.

It is said in support of the assignment of error that the de-
scription, taken in connection with other evidence in the case
is sufficient to identify the land; but no indication is given as
to what that evidence is, and we think the claim not well
founded. A deed must, by its terms, give a mark of the
property by which it can be identified. Proof by extrinsic
evidence that David Jones had such a tract and intended to
convey it would not cure the defect. No addition to the
terms of a deed can be made by parol evidence. If too un-
certain on its face to be operative, no aid can be derived
from parol evidence. The deed is incurable and void. 20
W. Va. 415; *Dickens* v. *Barnes*, 79 N. C. 490; *Radford* v.
*Edwards*, 88 N. C. 347; Dev. Deeds, sections 1010, 1011;
Warv. Vend. section 353.

The tenth assignment of error is founded upon an excep-
tion to the action of the court, in excluding a deed executed
by J. F. Johnson to George W. Lambert and others, dated
May 29, 1889, and acknowledged by said Johnson, who was
then clerk of the county court of McDowell county, before
his own deputy, J. C. Beavers, acting as such deputy. The
eleventh assignment relates to the exclusion of a deed from
John Atwell and wife to J. F. Johnson, dated June 10, 1889,
and acknowledged before said Johnson, as clerk of the county
court of McDowell county, or his deputy, J. C. Beavers,
who as his deputy, took the acknowledgment. These deeds
were properly excluded. A man can neither take his own
acknowledgment nor the acknowledgment of another per-
son to a deed, conveying property to him. For the latter
proposition, *Tavenner* v. *Barrett*, 21 W. Va. 656, is pointed
authority, and it seems much clearer that a person, acting as
an officer, cannot take and certify his own acknowledgment
as a private individual. *Davis* v. *Beazley*, 75 Va. 491; *Bea-
mon* v. *Whitney*, 40 Me. 413. A deputy acts for, on behalf
and in the name of, his principal. His act is, in law, the
act of the principal. On failure of the acknowledgments,
as proof of execution, no other evidence thereof was adduced.
If the execution of these deeds were proved otherwise than
by the certificate of acknowledgment, as far as that may be
done, they would be operative between the parties thereto.
*Wise* v. *Postlewait*, 3 W. Va. 452; *Tavenner* v. *Barrett*, 21
W. Va. 656; *Davis* v. *Beazley*, 75 Va. 491; *Bowden* v. *Par-*

*ish,* 86 Va. 67; *Corey* v. *Moore,* 86 Va. 721; *Clinch Riv. Veneer Co.* v. *Kurth,* 19 S. E. 878.

One of the briefs filed for plaintiff in error contains much argument, apparently supported by ample authority, to the effect that the evidence is insufficient to prove the title under the Parker and Webb patent to be in the plaintiffs. Cornelia L. Kilbourne, Elizabeth M. Floyd-Jones and Clarence B. Smith claim the Parker moiety, as heirs or devisees of Emiline Smith, and the criticism is that the evidence fails to show that these plaintiffs are all the children and descendants of Emiline Smith. The same objection is made to the evidence offered to prove the Webb moiety in the plaintiffs, Charlotte E. Webb, John Sidney Webb and H. Randall Webb. They are described by the witness as follows: "Charlotte E. Webb, his grandsons, and the only surviving children and issue of William B. Webb, deceased, as aforesaid, a son of said John F. Webb, only heirs at law of said John F. Webb." It suffices, for the present, to say that this evidence, as far as it goes, is relevant and, therefore, admissible; but, whether sufficient or not, would be matter for inquiry upon a motion to set aside the verdict, or to exclude the evidence or on a demurrer to the evidence. As the verdict must be set aside upon other grounds, and it will be possible for the plaintiffs to relieve themselves, on the next trial, of the objections made here, it is deemed unnecessary to pass upon the sufficiency of the evidence.

Nothing is said in the briefs in support of the attack upon the validity of the transfer provisions of the Constitution, section 3 of Article XIII. If the State has the power to forfeit land titles under section 6 of Article XIII, no reason is perceived why, having the title in herself, she may not bestow it upon whom she pleases. It seems to me that the only plausible argument against the validity of Article XIII of the Constitution must be founded upon the forfeiture clause in section 6. This clause has been sustained by a number of decisions rendered by this Court. *State* v. *Harman,* 57 W. Va. 447; *State* v. *Jackson,* 59 W. Va. 558; *State* v. *Swan,* 46 W. Va. 128; *Wiant* v. *Hays,* 38 W. Va. 681; *King* v. *Mullen,* 171 U. S. 404. All the cases just referred to deal with said forfeiture clause as a declaration of forfeiture, working a divestiture of title out of the owner and

vesting the same in the State by its own force and vigor. It seems to me that the true view of that clause is, that it lays down a rule, operating prospectively, under which the owner by his neglect of duty, his own act, forfeits his title, for the cause specified in said section 6. If he permits the occurrence of that cause, he loses his title, not by a declaration of forfeiture on the part of the State, but by his own delinquency. Whether he has title or not depends upon the existence or non-existence of the cause of forfeiture specified. The determination of that question is left to the courts. Neither the constitution nor the legislature has attempted to vest in any ministerial or executive officer the power to foreclose that question. The question of forfeiture is never settled conclusively as between the State and the former owner, or as between the latter and a grantee of the State or a claimant of the title by transfer, except by the adjudication of a court of competent jurisdiction, and never was intended to be. Therefore, neither the constitution nor any statute attempts to declare an absolute and conclusive forfeiture except by the adjudication of a court after a full opportunity to be heard. This view of the forfeiture clause makes it absolutely invulnerable to the charge of want of due process of law.

In support of the construction to which the foregoing expression of views tends, and the validity of the forfeiture clause of the Constitution, as so construed, I quote the following from Cooley on Taxation (3 Ed.) p. 863, italicising such portions as seem to me to indubitably express a proposition fully accordant with what I have said: "But if by forfeiture is understood the vesting in the State a title which shall be absolute and beyond dispute, the question presented is different. It is impossible that there can be any right to declare such a forfeiture, except as the result of an adjudication to which the owner was a party, which has determined that the default, upon which the forfeiture was based, exists in fact, and that the requisite steps which were to precede the forfeiture have actually been taken. In some judicial tribunal the party whose freehold is seized has a right to a hearing on these questions: a constitutional right, if constitutional protection to property are of any avail. *But if by forfeiture is understood only that without sale there shall pass to the*

state such title as a purchaser would acquire if a sale were to take place, the declaration of forfeiture can, of itself, work no absolute deprivation of rights. If the default existed and the tax proceedings are regular, the state has the title; if not, it remains in the person taxed. And, in the absence of any statute changing the burden of proof, it would devolve on the state to prove the regularity of the proceedings, precisely as it would on the purchaser when demanding the land under the deed given on a purchase."

The defendants in error, by cross-assignment, insist upon certain exceptions to the rulings of the court taken by them. One of these relates to the admission, over their objection, of a deed executed by Littleton Kirkpatrick, Sophia Astley Kirkpatrick, his wife, and Sarah H. Astley, to Henry Cramond, dated December 10, 1843. By another deed a conveyance from William Cramond to Thomas Astley had been shown, and the deed objected to recites that Sophia Astley Kirkpatrick was the only child and heir at law of Thomas Astley, deceased, and that Sarah H. Astley, the other grantor, was the widow of said Thomas Astley. The objection is that these recitals are the only evidence of the heirship of Sophia Astley Kirkpatrick, the widowhood of Sarah H. Astley, and the death of Thomas Astley. *Wiley* v. *Givens*, 6 Grat. 277, and *Bowers* v. *McCormick*, 23 Grat. 310, are relied upon as authorities sufficient to sustain the exception. In this view there is a failure to distinguish between deeds of late date and ancient deeds, in respect to the evidential character and force of their recitals. In the former class, they are not evidence against strangers, but, in the latter, they are. *Wilson* v. *Braden*, 56 W. Va. 372. *Fulkerson* v. *Holmes*, 117 U. S. 389, was an action of ejectment, presenting a controversy, arising out of claims under senior and junior patents, and there was an effort to prove forfeiture of the senior patent, as in this case. The plaintiffs were not in posission of the land and never had been; but the court allowed the recitals of a deed sixty-one years old, similar in all respects to the recitals in this one, to have the force and effect of evidence against strangers to it, and, in connection with the circumstances, disclosed by the deed itself and other documents, to establish the recitals as facts. This authority is decisive of the question arising on the

exception. Several others of similar import are cited in *Wilson* v. *Braden*. The court, therefore, properly admitted the deed.

The same objection was made to a deed from Sarah Cramond, Elizabeth Cramond and Anne Cramond to Henry Cramond, which fully recited the history of the tract and of the heirship of the grantors, and was dated November 5, 1846. The authorities, above referred to, sustain the action of the court in admitting this deed also.

Another deed objected to was one executed by George W. G. Brown, commissioner, in 1843, to Elizabeth, Anne and Henry Cramond. It was made under and by virtue of a decree, in a proceeding for the sale of the 320,000 acre grant to Robert Morris and another one of 480,000 acres as forfeited lands. The deed recited the sale of said 320,000 acres to William Cramond, which recital was followed by another in the following terms: "And the said William Cramond having departed this life since making said payment, leaving the children surviving him, namely, Elizabeth Cramond, Anne Cramond and Henry Cramond, who are his heirs at law, as appears by the affidavit of Henry Helmworth hereto annexed." A certified copy of a decree of the court in which the proceeding occurred, confirming the sale by the commissioner, was introduced in connection with the deed. At that time, it is said no formal decree of sale was required to be made by the court, a mere enforcement by the judge upon the report of the commissioner being sufficient; and, in this connection, it was shown that the report upon which the sale was predicated, after diligent search by the clerk of the court, could not be found. Then an order was introduced showing that such report was made and ordered to be filed. The decree confirming the report of the sale and ordering a deed to be executed to William Cramond, was made on the 29th day of September, 1843. A copy of another order was introduced, showing that Brown, as commissioner of delinquent and forfeited lands, had, on June 10, 1843, presented a report, which was then ordered to be filed, and the consideration thereof was deferred until the next term. This, also, is an ancient deed and its recitals as to the heirship of the grantees, taken in connection with the other documents introduced in evidence and the circumstances dis-

closed constitute evidence tending to prove the death of William Cramond and the grantees to be his heirs. As to the authority for making the deed to William Cramond, there can be no question. A copy of the decree, introduced in evidence, shows that, and no ground is perceived on which the parties can be required to go behind that decree and show regularity in all the proceedings. There is no attack upon it for irregularity and it must at least be *prima facie* evidence against the plaintiffs, who claim a different, strange and hostile title. *Walton* v. *Hale*, 9 Grat. 197 and *Ronk* v. *Higginbotham*, 54 W. Va. 137, require no more than that the decree, conferring authority upon the commissioner to execute the deed, be shown. But, as the deed was made to Cramond's heirs and not to him as directed, it is said that *Walton* v. *Hale* condemns it as an act in excess of the authority conferred by the decree. Its age, however, in consequence of which its recitals are evidence tending to show the death of the purchaser and the title of the grantees by inheritance from him, overcomes this objection. The deed in *Walton* v. *Hale* was of recent date, and its recitals went beyond the fact of pedigree, wherefore, in two respects, it materially differs from this one.

Another objection, insisted upon, is one relating to the deed from R. P. Spracher, special commissioner of the circuit court of Tazewell county, Virginia, to Max Lansburgh, dated March 17, 1873. Samuel Cameron executed a mortgage to Henry Stiles on the 50,000 acre tract of land heretofore mentioned. Afterwards, his equity of redemption came, by successive conveyances into the hands of Charles F. Mayer. In June, 1856, Stiles brought a suit to foreclose the mortgage. Mayer filed an answer, admitting all the allegations of the bill and acquiescing in the demand of Stiles for a decree, but asking a stay of five months from the 27th day of March, 1856. Thereupon, on the 27th day of August, 1856, a decree of sale was made and J. Stras appointed a special commissioner to execute it. On the 31st day of March, 1869, he sold the land to Max Lansburgh. The sale was reported and confirmed and a deed ordered to be executed to the purchaser by R. P. Spracher who was appointed a commissioner for that purpose. The ground of the objection is want of jurisdiction in the court to transfer the title because, be-

fore the sale was made, by the division of the state, all of the land except about 2,000 acres, fell within the jurisdiction of the state of West Virginia, whereby it is said the jurisdiction of the circuit court of Tazewell county, Virginia, failed. That the court had jurisdiction of the parties is not questioned, nor can it be disputed that it had full jurisdiction over the lands at the time the decree of sale was made. Its jurisdiction over a part of the tract of land, when the sale was made and the deed executed, is equally clear. If there was a defect in the jurisdiction, therefore, it was by partial failure of a previous full and complete jurisdiction, of both parties and subject matter. The following decisions are cited in support of the assignment of error: *Massey* v. *Wattle*, 6 Cranch 160; *Dickenson* v. *Hoomes*, 8 Grat. 411; *Barger* v. *Buckland*, 28 Grat. 863; *Poindexter* v. *Burrell*, 82 Va. 507; *Gibson* v. *Burgess*, 82 Va. 650; *Wimer* v. *Wimer*, 82 Va. 890; *Watts* v. *Waddle*, 6 Pet. 380; *Watkins* v. *Holeman*, 16 Pet. 25; *Burnley* v. *Stevenson*, 20 O. St. 474; *Salmon* v. *Price*, 13 O. St. 368; *Price* v. *Johnson*, 1 O. St. 392; *Blake* v. *Davis*, 20 O. St. 231; *Corbett* v. *Nutt*, 10 Wall. 464.

With the exception of *Barger* v. *Buckland*, these were cases in which the land lay entirely beyond the jurisdiction of the state. That was a case in which part of the land laid in Tazewell county, Virginia, and part in Mercer county, West Virginia, and one of the objects of the suit was to enforce the lien of a deed of trust on the land, which was done by means of a decree of sale, to be executed by a commissioner appointed by the court. The similarity of that case to this one is very striking. There, it was a deed of trust, the trustee in which, for some reason, could not act, in consequence of which the court enforced it by sale of the property through a commissioner. In this case, it was a mortgage which the court enforced in the same manner. There is a very marked distinction between cases of this kind and suits for partition, actions of ejectment and other proceedings relating directly and solely to the land. In suits for specific performance and foreclosure of mortgages, the court, having jurisdiction of the parties, may compel them to make conveyances. It does not act directly upon the land, but upon the parties. Having such power and authority, there is no lack of jurisdiction or power to effect, in this in-

direct manner, the land itself, and decrees are sustained, in such cases, which do not adhere strictly to the principle by causing conveyances to be made by the parties, but cause that to be done through its officers which the court had the power to compel the parties to do. Though there is some conflict of authority on this question, the better opinion seems to be that such decrees are not void. The leading case on the subject is *Muller* v. *Dows*, 94 U. S. 444; the subject of which was the foreclosure of a mortgage on a railroad, part of which was in Iowa and the balance in the state of Missouri. The decree directed a sale of the entire property notwithstanding a part of it extended beyond the jurisdiction of the court. Application of the same principle will be found in *Brown* v. *Canal Co.*, 73 Md. 484, 608; *Trust Co.* v. *Olmstead*, 102 N. Y. 729; *House* v. *Lockwood*, 40. Hun. (N. Y.) 532; *Cooley* v. *Scarlett*, 38 Ill. 316; 87 Am. Dec. 298; *Bridge & Tramway Co.* v. *Trust Co.*, 81 Fed. Rep. 422; *Eaton* v. *McCall*, 41 Am. St. 561; *Toller* v. *Carteret*, 2 Verm. 494; *McElwrath* v. *Railroad Co.*, 55 Pa. St. 189; *Lyman* v. *Lyman*, 2 Payne 46; *Wood* v. *Warner*, 15 N. J. Eq. 81; *Moore* v. *Jeager*, 2 McArthur 465; *Dickenson* v. *Hoomes*, 8 Grat. 353. It is to be observed here that the legal title to the land was in Stiles, subject to a mere equity in Mayer. The deed itself put the title conditionally in Stiles. Failure of that condition subsequent, in the eye of the law, put the title unconditionally in him, leaving to Mayer nothing except a mere equitable right to be relieved from the forfeiture by payment, of the mortgage debt. Therefore, upon the bill filed by Stiles and the answer of Mayer admitting its allegations and Stiles' right to the relief asked for by him, the court had full jurisdiction and power over the legal title. That title was an entirety. It extended to the whole tract of land, no more to one part than to another part, no more to the land in Virginia than to the land in West Virginia; and, by any attempt to divide the land, injury might have resulted to both parties. It may have been much to the interest of both to have the land sold or redeemed as a whole. This is a consideration and view which had much weight with the court in the case of *Muller* v. *Dows*, and justly so it seems to me. Whether the court, in addition to dealing with the title to the land and disposing of it, having full power to that extent, could

have sent its officers over into the state of West Virginia to deliver possession, is a very different question. Titles are bought and sold everywhere and at all times without actual delivery of possession. Hence, no reason is perceived why the power of the court to put the purchaser into possession should be made the test of jurisdiction, and power to act, when the court is dealing with the title only, after jurisdiction of it has been properly acquired.

As the plaintiffs must recover, if at all, on the strength of their own title, their right to object to the introduction of the deeds just discussed is not entirely clear; but, under the peculiar circumstances of the case, each side claiming to have acquired the title of the other by forfeiture, and transfer, it may be necessary for the plaintiffs to show a break in the title of the defendant, in order to save their own. For this reason, we have passed upon the objections to the deeds.

For the reasons stated, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and Remanded.*

BRANNON, JUDGE:

For reasons which I give in *Stockton* v. *Craig*, 56 W. Va. 477, I cannot think that land purchased by the state for taxes, though the sale be void, is forfeited for omission after sale. I suppose the officers ought to enter the tract, if the owner requests; but if he does not do so, I cannot see how there can be a forfeiture when the statute has released him from keeping it on the books.

As to the conveyance by a commissioner appointed by a Virginia Court. The sale decree was prior to the new state, but never carried out till afterwards by sale. All agree that a court of one state cannot by decree, or by deed of a commissioner under it, pass land wholly in another state. *Wilson* v. *Braden*, 48 W. Va. 196; *Bullock* v. *Bullock*, 46 Am. St. R. 528. If the party having title, whether individual owner, mortgagor or trustee, be present, the court can, by compelling him to make a deed, pass title in another state; but cannot by force of the decree or by a commissioner, for his deed has no more force than the decree, he having no title in him. I admit that *Muller* v. *Dowe*, 94 U. S. 444, and some other cases allow courts in one state to sell all the road and prop-

erty of a railroad or canal corporation under a mortgage though in different states. Do they apply to a tract of land divided by state line? It may be that the entire tract is the one *res* acted on. But it does seem to me strange that one state by its judicial power can pass right to land in another. Do those cases extend to land? In case of a railroad or canal there is necessity not to cut it in pieces; but how as to land? In the case of *Muller* v. *Dowe*, the court said it could not give possession, but could make the trustees pass title, they being plaintiffs. It barred the company by personal decree from further claiming and decreed that the defendant company convey to the purchaser. Is not this a distinction? Does that case say that where they are not bodily present so as to be forced to pass title, the mere decree can do so? The case of *Barger* v. *Buckland*, 28 Grat. 850, was land; but the point was not well considered.

The authors understand the rule as requiring the person having title to be bodily present, so that the court may act *in personam*. It cannot act *in rem*. Jones on Corp. Bond, section 360; Jones on Mortgages, section 1444; 5 Pomeroy Eq. (Rem.) section 17, note, "Foreclosure of Mortgages," 4 *Id*. section 1318. Our case of *Piedmont* v. *Green*, 3 W. Va. 54; I understand so, though there are some *obiter* expressions tending otherwise.

I cannot see how there is any difference between a tract of land divided by a state line and one entirely in another state. One state cannot exercise power over a foot of the soil of another. The judgment upon title in one state would not bind a court in another. Just now I see that there is a full discussion sustaining the above view in Wharton on Conflicts of Law (3rd Ed.) section 288, *et seq.*